ELIZA WARREN, NETTIE STEVENS, H. J. HO-
GAN, R. J. HILL, F. T. SANFORD, RICHARD
HILL, ALBERT SADD, JOHN BREMAN, JOHN
ATKINSON, A. E. SHAW, HYRUM MADDEN,
AND JOHN J. CORTEZ, Appellants, v. THEO-
DORE ROBISON, CHARLES M. BROUGH, H. H.
SPENCER, GEORGE MURPHY, AD. KUHN,
JOHN MAGUIRE, R. A. WELLS, NEWALL
BEEMAN, GEORGE W. PERKINS, S. S.
SCHRAMM, W. W. COREY, CITIZENS' BANK
OF OGDEN, AND J. C. ARMSTRONG, Respond-
ENTS.

BANK DIRECTORS — DELEGATION OF AUTHORITY — MISMANAGEMENT
BY EXECUTIVE OFFICERS — LIABILITY OF DIRECTORS. DIRECT-
ORS BOUND TO USE ORDINARY CARE AND PRUDENCE. ACTION
BY STOCKHOLDERS AND CREDITORS AGAINST DIRECTORS FOR AC-
COUNTING AND DAMAGES — PRIMA FACIE CASE — NON-SUIT.

1. *Bank Directors — Delegation of Authority — Mismanagement by
Executive Officers — Liability of Directors.*

A board of directors of a banking corporation is elected pri-
marily for the management of the corporate affairs ; and when
the board delegates its authority to the executive officers and
through their carelessness and mismanagement disaster and
loss to the stockholders and creditors ensue, the individual
members of the board can not escape liability by showing that
they did not know of the unfortunate transactions and were
ignorant of the business of the corporation.

2. *Directors Bound to Use Ordinary Care and Prudence.*

Directors of a banking corporation are bound to use ordinary
care and prudence, and to exercise over the affairs of the bank
such supervision and vigilance as a discreet person would
exercise over his own affairs.

3. *Action by Stockholders and Creditors against Directors for Account-
ing and Damages — Prima Facie Case — Non-Suit.*

A showing that certain directors of a defunct banking institu-

19 Utah—19.

tion were careless and negligent in the performance of their duties as such directors, that they exercised no supervision over the conduct of its affairs, but turned everything over to the executive officers and allowed loans to be made to the officers of the bank and to others practically without security, and that these loans resulted in wrecking the bank, in an action on behalf of stockholders and creditors for an accounting and for damages, is a sufficient showing to establish a *prima facie* case against such directors and a non-suit as to them was improperly granted.

(Decided April 26, 1899.)

Rehearing denied May 17, 1899.

Appeal from the Second District Court, Weber County, Hon. Wm. M. Mc Carty, *Judge.*

Action by plaintiffs as stockholders of defendant bank in behalf of themselves and all other stockholders, creditors, and others similarly situated, against defendants for an accounting, and for damages alleged to have been occasioned by reason of negligence in the management by its officers and directors.

From a judgment for defendants, plaintiffs appeal. *Modified.*

*M. D. Lessinger, Esq., A. J. Weber, Esq., Elijah Farr, Esq.,* and *Messrs. Bennett, Harkness, Howat & Bradley,* for appellants.

The general control and management of all the affairs and transactions of the bank rest with the board of directors.    Morse on Banks and Banking, 3d ed., Secs. 115, 116; Reid on Corporate Finance, Secs. 181; Morse on Banks and Banking, 3d ed., Sec. 117; Reid on Corporate Finance, Sec. 299.

Directors are trustees for the stockholders and the bank, and must be vigilant in their trusts, and must not have conflicting interests.    *Butts* v. *Woods,* 38 Barb., 181; *Cumberland, etc.,* v. *Parish,* 42 Md., 298.

They must use ordinary diligence in the management of the bank's affairs, and in understanding its resources and liabilities can not be heard to say that they were not apprised of acts, accounts, and correspondence of the bank, or which with the exercise of such diligence they might otherwise have known. *Gibbons* v. *Anderson*, 80 Fed., 345; *Williams* v. *Mc Kay*, 53 Am. Rep., 775; *Marshall* v. *F & M. S. Bank*, 17 Am. State Reports, 84.

Directors of banks are bound to constant activity and thorough acquaintance with the daily course of affairs and dealings of the institution. They are bound in law to know the securities of the bank, its bills payable, maturity of its papers, and who are the parties. It is their duty to know the condition of the bank. Reid on Corporate Finance, Sec. 299; *Gibbons* v. *Anderson*, 80 Fed., 345; *Houston* v. *Thurston* (N. C.), 29 S. E., 827; *Marshall* v. *F. & M. S. Bank*, 17 Am. St., Rep., 84; *Martin* v. *Webb*, 110 U. S., 15; Morse on Banks, etc., 3d ed., Sec. 128.

If directors are guilty of gross negligence, and inattention to the duties of their trust, they will be personally liable if they suffer the coporate funds or property to be wasted or lost by reason of such negligence and inattention. Reid on Corporate Finance, Sec. 233; *Brinkerhoff* v. *Bostwick*, 88 N. Y., 52; *Horn Silver Mg. Co.* v. *Ryan*, 42 Min., 196; *Bank* v. *Bosseiux*, 3 Fed., 817.

Ignorance of any fact in the bank's affairs which it is their duty to know, can never be set up by them in defense or exculpation for any act which the existence of that fact should have prohibited.

When the directors have a duty to perform, and fail to perform that duty, they will not be permitted to plead ignorance. *Marshall* v. *Bank*, 17 Am. St. Rep., 84. That the directors are liable, see *Williams* v. *Mc Kay*, 40

N. J. Eq., 189; *Bank* v. *Bosseiux*, 3 Fed., 817; *Marshall* v. *Bank*, 17 Am. St. Rep., 84.

*Messrs. Rogers & Johnson* and *R. H. Whipple, Esq.*, for respondent.

The right to maintain this action would in the first instance be in the corporation, by the assignment, that right, the chose in action, passed under the deed of assignment to the assignee, as trustee, and when he was removed, and the receiver appointed, then both the right to sue and the title to the chose in action, or the cause of action, became lodged in him, in trust, together with all other assigned property, which constituted the trust fund, and that fund (under the provisions of the assignment) was held by him, (first) in payment of the expenses of the trust; (second) payment of all creditors of the bank; (and lastly) if there be any surplus remaining, to purchase, as directed by the assignment deed, capital stock of the Utah National Bank, which was to be divided pro rata among the stockholders of the Citizens' Bank.

Even in the absence of such written declarations of trust, the law would have declared the trust fund held, after payment of the expenses of executing the trust, liable; First, for the payment of the creditors of the bank. *Mercantile Co.* v. *Mt. Pleasant Co-op.*, 13 Utah, 213–231.

And, as we have before urged, the receiver succeeded to the corporate rights of action. *Terry* v. *Bamberger*, 14 Blatchf., 234; *Brouwer* v. *Hill*, 1 Sandf., 629; *Willink* v. *Canal Co.*, 4 N. J. Eq., 377· *White* v. *Haight*, 16 N. Y., 310.

Under the theory adopted by plaintiffs, the bank was a necessary party. It was never served with summons or appeared in this action, and, therefore, was never

before the court as a party. Defendants' motions for non-suit were, therefore, properly granted on that ground. *Brinkerhoff* v. *Bostwick*, 88 N. Y., 52–61; *Robinson* v. *Smith*, 3 Paige, 222.

As we have seen, whether or not the defendants in this action were negligent under the circumstances of the case is a question of fact. Even admitting that if upon consideration of the evidence it appears that fair and reasonable minds might reach different conclusions, this court would not reverse the judgment. *Wells* v. *Wells*, 7 Utah, 68; *Dooly Block* v. *Rapid Transit Co.*, 9 Utah, 31; *Mc Kay* v. *Farr*, 15 Utah, 261.

*Messrs. Marshall, Royle & Hempstead* and *Messrs. Rogers & Johnson*, for respondent Beeman.

The following are well-established rules as to the liability or non-liability of directors :

1. Where directors are clothed with a discretion, they are not responsible to the corporation for damages flowing from an exercise of this discretion, however erroneous their exercise of it may have been.

2. In respect of their ministerial duties, they are not responsible to the corporation for anything short of gross negligence, non-attendance, and fraud. *Godbold* v. *Bank*, 11 Ala., 191; 11 Spering's Appeal, 71 Penn. St.

The leading English cases presenting the above doctrines are : *Colt* v. *Woolaston*, 2 P. Williams, 154; *Percy* v. *Millandon*, 8 Mart. ( N. S.), 68.

The last-named case is quoted with approval in *Steamboat* v. *King*, 16 Howard (N. S.), 469; Warton on Neg., Sec., 510; Story on Bailments, Sec. 173.

As the directors impliedly stipulate with the stockholders to give no more than good faith and ordinary or rea-

sonable care. *Smith* v. *Prathville Mfg. Co.*, 29 Ala., 503; *Hodges* v. *New Eng. Screw Co.*, 1 R. I., 312.

We call the attention of the court especially to the able work of Thompson on Corporations, Vol. 3, Sec. 4104.

That a director is not liable for the faults or frauds of a co-director appears to be well recognized in New York. *Wakeman* v. *Dalley*, 51 N. Y., 27; *Arthur* v. *Griswold*, 55 N. Y., 400; *Hun* v. *Carey*, 82 N. Y., 65.

Bartch, C. J.

This action was instituted by the plaintiffs as stockholders of defendant Citizens' Bank, in behalf of themselves and all other stockholders, creditors, and others similarly situated, against the defendants for an accounting, and for damages alleged to have been occasioned, by reason of negligence in the management of the bank, by its directors and officers. It appears that the bank was organized about August 11, 1890, with a capital stock of $150,000, and the banking business commenced soon thereafter. It failed and made an assignment for the benefit of its creditors, on December 26, 1893, and afterward a receiver was appointed. The defendants, H. A. Spencer, George Murphy, Ad. Kuhn, John Maguire, R. A. Wells, Newall Beeman, George W. Perkins, S. S. Schramm, and W. W. Corey were directors. W. W. Corey was the first president, and Newall Beeman was the president when the bank failed. The defendant, Theodore Robison, was vice-president and manager, and Charles M. Brough was cashier. J. C. Armstrong was receiver. The transactions, which resulted disastrously to the bank, and which, it is claimed, were made because of the negligence of the directors and officers, are of such a character as to require careful investigation. It is certainly quite startling to notice that a bank

in the hands of honest business men, as the directors and officers were reputed to be, should in so short a space of time meet with so many heavy losses as to actually wreck the institution. The losses, it appears from the testimony, began immediately upon the commencement of the business, as is evidenced by the shortage of Barbour, the first cashier, who, although a banker of good reputation, was, it seems, a stranger to the directors. He was placed in charge of the funds of the bank without first having given a bond, as required by the articles of incorporation, in respect to active executive officers, and through the leniency of the directors had given no bond at the time of his death, which occurred about three weeks after the commencement of the corporate business. Then, upon the cash being counted, a shortage of $3,600 was discovered which resulted in a total loss. Soon after the organization of the bank, the Anderson Pressed Brick Company, a new corporation, became one of its customers, and loans were made to it, which resulted in a loss to the bank of $22,000. That corporation was capitalized at $50,000, and one witness said its plant was worth in the neighborhood of $45,000, while other witnesses estimated its value to have been, about the time the loans were made, from $12,000 to $20,000. One of the directors of the bank was also a director in the brick company. After the loans were made, security was taken on the plant, but, owing to a misdescription in the mortgage, the security proved to be worthless, after the company had become otherwise involved and judgment had been entered against it. In 1891, the Junction City Driving Park Association was organized for the purpose of promoting an interest in horses. Several directors of the bank also became directors of the association, and the president of the bank was its president, and the vice-

president of the bank was the treasurer of the association. Through this association, by way of loans and overdrafts, made and permitted, it appears, without security, the bank lost about $1,700. So the Junction City Paint Company borrowed of the bank $4,750, and afterward another creditor, it appears, attached the property of the company, and then the bank bought in the stock for $4,360, paid off the judgment of the creditor, and carried on the paint business, under the name of H. Gillette & Co., until a purchaser was found for the stock. The loss to the bank occasioned by this transaction was over $9,000.

The bank was also unfortunate in dealings with Corey Brothers & Co. Its president, W. W. Corey, was a member of that firm, and the firm borrowed money from the bank from time to time, without security, until, when it failed in business and assigned, it owed the bank $28,000. The firm had also borrowed from another bank about $70,000, but that, it seems, was secured by real estate. The evidence relating to the transactions resulting in the $28,000, yet remaining unpaid, is such, to say the least, as to raise a strong suspicion of negligence on the part of those whose duty it was to supervise the affairs of the bank; and it savors much of a violation of law.

The loan to James C. Lonergan of $700 also resulted in a loss to the bank. This loan was recommended by one of the directors, and was made without security.

So, it appears the bank lost $3,200, through loans and overdrafts, without security, except some bank stock, to Theodore Robison, its manager.

Likewise its cashier, Helfrich, made overdrafts and received loans, which resulted in a loss to the bank of $6,375. The overdrafts, it appears, he began to make in October, 1890.

Another loan which proved unfortunate and a loss to

the bank, was one of $10,000 to the Cache Valley Land and Canal Company. The plaintiffs claim this loan was made indirectly to the officers of the bank. It appears that Robison, the manager of the bank, was also president of the Canal Company; that Brough, the bank's cashier at the time of the loan, was treasurer and director of that company; and that Corey, the president of the bank, was vice-president and a director of the company. The canal and property of that company was situated in the State of Idaho.

Such are the losses complained of in this case, and, as will be noticed, they aggregate over $84,500.

At the trial, when the plaintiffs rested their case, various motions for non-suit were made, and, upon argument, granted by the court, except as to defendant W. W. Corey.

The important question presented is, Did the plaintiffs make out a *prima facie* case? To determine this, it is necessary to consider first the degree of care and diligence and the extent of supervision which must be exercised by directors and officers of a banking institution, so as to discharge their duty to stockholders and creditors, and then ascertain whether, under the evidence, as it now appears, all or any of the defendants exercised such supervision, skill, and diligence, as the circumstances and nature of the business required.

It is not contended that the directors knowingly permitted any violation of law in any banking transaction, or that they were dishonest in the administration of the bank's affairs, but it is insisted that they wrongfully intrusted the exclusive management and control of the banking business to the cashier and manager, and were negligent in the performance of the duties imposed upon them by law.

The statute under which this bank was incorporated, and its business transacted, is found in the C. L. U. 1888, and provides in Section 2498, subdivisions 5 and 7, as follows:

"To elect by its stockholders, directors from time to time, and by its board of directors, to appoint a president, a vice-president, cashier, and such other officers as shall be provided for in its articles of association, define their duties, require bonds of them, and fix the penalty thereof, dismiss such officers or any of them at pleasure; and appoint others to fill their places.

"To exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking by discounting or negotiating promissory notes, drafts, bills of exchange, and other evidences of debt, by receiving deposits, by buying and selling exchange, coin, and bullion, and by loaning on personal or real security."

No doubt the board of directors of a bank incorporated under the act, of which these provisions form a part, may appoint executive and other officers, as therein provided, and may "carry on the business of banking" through such officers, but this does not release the directors from the duties which devolve upon them. It does not follow that the responsibility of the board, or of the individual director, ends with the appointment of honest men to the executive offices. The language of the statute does not enable the directors to say that they have no duties of supervision and control. If it had been the intention of the Legislature that the officers provided for should have full control, without supervision, of the business transactions and affairs of a bank, then it would have been a useless thing to provide for a board of directors, for the stockholders could elect such officers as

easily as they could the board.   The Legislature had in view no such purpose.   The directors were not intended to be mere figureheads without duty or responsibility. The manifest design of the lawmakers was that the officers, elected by the board, were to look after and attend to the details of business, and generally to conduct ordinary business matters.   They are the means with which the directors are to administer the affairs of the bank.   It is therefore the right and duty of the directors to take upon themselves the management of the institution, and to exercise and maintain a supervision over all business operations upon the skillful and wise conduct of which depend the prosperity of the institution and the safety of those dealing with it.   This duty of management and supervision, they can not shift upon the officers, and such duty is imposed as to no department of the banking business more certainly than that of making loans and discounts.

Morse on Banks and Banking, Sec. 117.

It is true, the executive officers attend to and execute the details of the transactions of the institution, but it is nevertheless incumbent upon the board of directors to possess a general knowledge of the character of the transactions and of the manner in which they are made. While such directors are not required to watch the ordinary routine of business, or observe the exact state of each day's accounts, still they are bound to possess a general knowledge of the manner in which the business is transacted, and of the character of the transactions, and to maintain such a degree of vigilance over, and intimacy with, the business as will enable them to know to whom, and upon what security, the large lines of credit are given.   Especially is this so as to large loans and discounts, or matters at once affecting the stability

and prosperity of the bank, and the safety of depositors. It is true, directors of a banking institution will not be held responsible for sudden and unexpected violations of law or duty by executive officers, or for losses which ordinary vigilance could not prevent. Nor is a director responsible for acts committed, transactions made, or losses incurred before he became a member of the board, or for any act of the board done in his absence and without his knowledge and assent, or for the default of a co-director made without his connivance or assent. *Briggs* v. *Spaulding*, 141 U. S. 132.

The duties of officers appointed by the board are of an executive character and relate mainly to details, and doubtless the making of a loan or discount in any considerable amount, or the transaction of other business of moment, should be preceded by an authorization from the board. The duties of directors are administrative, relate to supervision and direction, and when it is sought to hold them responsible for a dereliction of duty, because of which a loss occurred to stockholders and creditors, they can not evade liability by pleading ignorance of the affairs of the institution, incompetency, or gratuitous service, or that the management of the banking business was in the hands of the cashier or other executive officer.

" Where there is a duty of finding out and knowing, negligent ignorance has the same effect in law as actual knowledge. While the directors of a corporation may and must, as already stated, commit the details of its business to inferior officers, this does not absolve them from the duty of maintaining a reasonable supervision, and if such inferior officers waste the assets of the corporation, it is conceded that the directors can not escape liability on the ground that they did not know of the wrongdoing, provided that it appear that their ignorance

was the result of a want of that care which ordinarily prudent and diligent men would exercise under similar circumstances." Thomp. Corp., Sec. 4108. And their liability does not depend upon statute. "The liability of directors to the corporation for damages caused by unauthorized acts rests upon the common law rule which renders every agent liable who violates his authority to the damage of his principal. A statutory prohibition is material under these circumstances merely as indicating an express restriction placed upon the powers delegated to the directors when the corporation was formed." Morawetz on Priv. Corp., Sec. 556; *Brinckerhoff* v. *Bostwick*, 88 N. Y., 52.

Such is likewise the case where damages have resulted to stockholders and creditors, through unauthorized acts or omissions of duty in the management of the corporate business. Nor is such liability affected by the technical relation existing between the directors and the corporation, stockholders, or creditors. It exists whether the relation be that of trustees to *cestui que trust*, or of agents to principals. Doubtless as between the bank and a director it is mainly that of principal and agent, while under some circumstances the relation of trustee to *cestui que trust* may exist. Whatever the technical relation may be, to determine what acts or omissions amount to actionable negligence is a matter of no little difficulty. Undoubtedly each case must depend upon its own peculiar circumstances. The opinions of judges, respecting the degree of care, skill, and diligence which directors of a banking institution must exercise in order to avoid liability for negligence, are not all harmonious. That they must exercise some degree of care and diligence is not subject to controversy. What degree of negligence will render them liable? What degree of care and diligence must they exercise to avoid liability? Some of the courts have

held that such directors are liable only for *crassa negligentia*, which taken literally means gross negligence. That phrase, however, has been held to mean a want of ordinary care and diligence. In *Scott* v. *DePeyster*, 1 Edw., Ch. 513, the Vice-Chancellor said :

" I think the question in all such cases should and must necessarily be, whether they have omitted that care which men of common prudence take of their own concerns. To require more would be adopting too rigid a rule and rendering them liable for slight neglect ; while to require less would be relaxing too much the obligation which binds them to vigilance and attention in regard to the interests of those confided to their care and expose them to liability for gross neglect only, which is very little short of fraud itself."

In Spering's Appeal, 71 Pa. St., 11, Mr. Justice Sharswood said : " They (directors) can only be regarded as mandataries — persons who have gratuitously undertaken to perform certain duties, and who are therefore bound to apply ordinary skill and diligence, but no more."

In 3 Thompson Corp., Sec. 4104, the author says : " While a class of decisions places the liability of directors under this head on a ground more favorable to them, by restraining it to cases of gross and habitual negligence, non-attendance, and inattention to their duties, yet none of the decisions exact more than reasonable business knowledge and skill, strict good faith, and a reasonable measure of care and diligence under the circumstances of the particular case." And in Sec. 4106, he says: " It is plain that the expression ' gross negligence ' is loosely used in many of the judicial decisions, and that it is sometimes used as the mere antithesis of a want of ordinary care." *Hun* v. *Carey*, 82 N. Y., 65; *United Society of Shakers* v. *Underwood*, 9 Bush., 609.

Evidently persons who, as directors, assume control of a banking institution, must exercise such a degree of care, skill, and diligence as is required by the situation and nature of the business. By taking such positions, although without compensation, directors invite confidence that they possess at least ordinary knowledge and skill, and that they will do all that men of reasonable prudence and caution ought to do to protect the interests of stockholders and depositors, or those dealing with the institution. The public therefore have a right to suppose that they are men of high character for integrity, of reasonably sound judgment, and of such good business sense as is necessary to conduct the affairs of the bank wisely and with reasonable safety. Acting upon this supposition, the public trust their deposits with the bank in the confidence that the important duty of management and direction will be discharged by the directors. The directors, however, ought not to be held to the highest degree of care and diligence, for that might prevent men whose unspotted reputations and good business judgment would give character and stability to the institution, from accepting such positions; nor should they be held to the slightest degree, for that would have a tendency to destroy public confidence, and few men would be willing to deposit their money with the bank. The rule most in harmony with the character and well being of such an institution appears to be that the directors in administering its affairs, must exercise ordinary care, skill, and diligence. Under this rule it is necessary for them to give the business, under their care, such attention as an ordinarily discreet business man would give to his own concerns under similar circumstances, and it is, therefore, incumbent upon them to devote so much of their time to their trust as is necessary to familiarize them with the business of the institution, and to supervise

and direct its operations. That the board of directors can leave the management of the banking business to the executive officers, and then when, through carelessness and mismanagement, disaster to the stockholders and creditors ensues, avoid liability on the ground that they did not know of the unfortunate transactions, and were ignorant of the business, is a notion which must be repudiated. If, however, directors acting in good faith, and with reasonable care, skill, and diligence, nevertheless fall into a mistake, either of law or fact, they will not be liable for the consequences of such mistake.

Bearing upon the general subject herein discussed, is the very instructive case of the *Charitable Corporation* v. *Sutton*, 2 Atk., 400, where the action was brought for relief against the defendants, committee-men, and other officers of a corporation, for breaches of trust, fraud, and mismanagement, and in which were involved questions of the liability of directors. Among the objects of the corporation was that of banking with notes payable on demand within the amount of the stock, and of lending money on pledges, etc. Among the things complained of was a method of advancing money several times upon old pledges, which were not worth more than the first sum lent, or giving credit upon imaginary pledges. Under the charge of *crassa negligentia*, the breaches of duty, amongst others complained of, were non-attendance of committee-men or directors upon their employment, never once inspecting the warehouse to see what number of real pledges were there, and putting the whole power into the hands of others. Lord Chancellor Hardwicke, conceding that the employment was not one affecting the government, said : "I take the employment of a director to be of a mixed nature : it partakes of the nature of a public office, as it arises from the charter of the crown. * * *

Therefore, committee-men are most properly agents to those who employ them in the trust, and who empower them to direct and superintend the affairs of the corporation. In this respect they may be guilty of acts of commission or omission, of mal-feasance or non-feasance." Referring to mal-feasance or non-feasance, the Chancellor said: "To instance in non-attendance; if some persons are guilty of gross non-attendance, and leave the management entirely to others, they may be guilty by this means of the breaches of trust that are committed by others. By accepting a trust of this sort, a person is obliged to execute it with fidelity and reasonable diligence; and it is no excuse to say that they had no benefit from it, but that it was merely honorary; and therefore they are within the case of common trustees. Another objection has been made, that the court can make no decree upon these persons which will be just, for it is said every man's non-attendance or omission of his duty is his own default, and that each particular person must bear such a proportion as is suitable to the loss arising from his particular neglect. which makes it a case out of the power of this court.

" Now if this doctrine should prevail, it is indeed laying the ax to the root of the tree. But if, upon inquiry before the master, there should appear to be a supine negligence in all of them, by which a gross complicated loss happens, I will never determine that they are not all guilty. Nor will I ever determine that a court of equity can not lay hold of every breach of trust, let the person be guilty of it either in a private or public capacity."

In Land Credit Company of *Ireland* v. *Lord Fermoy* L. R. 5, Ch. 763, Lord Hatherley said: "I am exceedingly reluctant in any way to exonerate directors from performing their duty, and I quite agree that it is their

19 Utah—20

duty to be awake, and that their being asleep would not exempt them from the consequences of not attending to the business of the company. But we must look at the nature of the business of the company."

So, in *Briggs* v. *Spaulding*, 141 U. S., 132, 165, a case on which the respondents appear to rely, Mr. Chief Justice Fuller, speaking for the court, said: "Without reviewing the various decisions on the subject, we hold that directors must exercise ordinary care and prudence in administration of the affairs of a bank, and that this includes something more than officiating as figureheads. They are entitled under the law to commit the banking business, as defined, to their duly authorized officers, but this does not absolve them from the duty of reasonable supervision, nor ought they to be permitted to be shielded from liability because of want of knowledge of wrongdoing, if that ignorance is the result of gross inattention."

In that case the law seems to be stated with much liberality in favor of directors, and it seems a very liberal application of the law to the facts was made in favor of the defendants, and four of the jurors dissented, but still the conclusion was reached that directors must exercise ordinary care and prudence, holding that the committing of the banking business by them to the officers does not absolve the directors from reasonable supervision.

In *Cutting* v. *Marlor*, 78 N. Y., 439, Mr. Chief Justice Church said: "A corporation is represented by its trustees and managers; their acts are its acts, and their neglect its neglect. The employment of agents of good character does not discharge their whole duty. It is misconduct not to do this, but in addition they are required to exercise such supervision and vigilance as a discreet person would exercise over his own affairs. The bank might not be liable for a single act of fraud or crime on the part of an officer or agent, while it would be for a

continuous course of fraudulent practice, especially those so openly committed and easily detected as these are shown to have been. Here were no supervision, no meetings, no examination, no inquiry."

So, in *Williams* v. *McKay*, 40 N. J. Eq., 189, where the observations of Lord Chancellor Hardwicke and Hatherley were referred to with approval, Mr. Chief Justice Beasley, delivering the opinion of the court, said: "I entirely repudiate the notion that this board of managers could leave the entire affairs of this bank to certain committee-men, and then, when disaster to the innocent and helpless *centuis que trustent* ensued, stifle all complaints of their neglects by saying, We did not do these things, and we know nothing about them." And again he said: "The misconduct in question was manifested in frequent, glaring instances, and it is not easy to imagine how they, or some of them, failed to be discovered by these boards of managers on the supposition which, in their favor the law will make, that they exercised their office in this respect with a reasonable degree of vigilance. The neglectful acts in question can not be regarded by the court as isolated instances, for they run through the whole period of the life of this institution, and thus evince a systematic and habitual disregard of the directions of the company's charter, and a very striking indifference with regard to the security of the money held in trust by them."

In *Hun* v. *Carey*, 82 N. Y., 165, where the question of the degree of vigilance to be exercised by directors of a savings bank was involved, Mr. Justice Earl, speaking for the court, said: "Few persons would be willing to deposit money in savings banks, or to take stock in corporations, with the understanding that the trustees or directors were bound only to exercise slight care, such as

inattentive persons would give to their own business, in
the management of the large and important interests com-
mitted to their hands.   When one deposits money in a
savings bank, or takes stock in a corporation, thus divest-
ing himself of the immediate control of his property, he
expects, and has the right to expect, that the trustees or
directors, who are chosen to take his place in the man-
agement and control of his property, will exercise ordi-
nary care and prudence in the trusts committed to them,
the same degree of care and prudence that men prompted
by self-interest generally exercise in their own affairs.
When one voluntarily takes the position of trustee or
director of a corporation, good faith, exact justice, and
public policy unite in requiring of him such a degree of
care and prudence, and it is a gross breach of duty —
*crassa negligentia* — not to bestow them."

So, in 3 Thomp. Corp., Sec. 4108, with reference to
the liability of directors for negligent ignorance of cor-
porate affairs, it is said: "The true theory disregards the
subtile and impracticable distinction between ordinary
negligence and inattention and gross negligence and
inattention, and holds directors responsible for not know-
ing that of which they had the means of knowledge; and
while relieving them from the responsibilities of insurers,
ascribes liability on the ground of ignorance of that which
could have been discovered by that good business dili-
gence which is incumbent upon them."   1 Morse on
Banks and Banking, Secs. 116, 125, 126, 128; 1 Mora-
wetz on Priv. Corp., Secs. 552–562; 1 Reid on Corporate
Finance, Sec. 181; 3 Thomp. Corp., Sec. 4113; 2 Am. &
Eng. Ency. of Law, 114–116; *Gibbins* v. *Anderson*, 80
Fed. Rep., 345; *Marshall* v. *Farmers'*, *etc.*, *Savings Bank*,
17 Am. St. Rep., 84; *Houston* v. *Thornton*, 132 N. C.,
365; *Horn Silver Min. Co.* v. *Ryan*, 42 Minn., 196;

*Cumb. Coal and Iron Co.*, v. *Parish*, 42 Md., 598; *Ackerman* v. *Halsey*, 37 N. J. Eq., 356; *Delano* v. *Case*, 121 Ill., 247; *Martin* v. *Webb*, 110 U. S., 7: *Trustees Mut. Bldg. Fund* v. *Bosseiux*, 3 Fed. Rep., 817; *Branning* v. *Loving*, 82 Ky., 370; *Stephens* v. *Monongahela Natl. Bank*, 88 Pa. St., 157.

Having thus, in the light of authority, considered the degree of care, skill, and diligence which directors of a bank must exercise to avoid liability for acts of commission or omission which result in loss to the institution, its stockholders, or creditors, it now becomes important to ascertain whether, under the evidence in this case, as it now stands, the defendant directors are shown guilty of such negligence, as will render all or any of them liable for the losses occasioned by the transactions of which the appellants complain; and the alleged liability is such that facts must be examined as to each of them.

The testimony shows that the defendant Beeman was ✓ (¹) elected director and president of the bank in January, 1893. But one of the loans complained of was made during his term of office, and that was the one to the Cache Valley Land and Canal Co., which was made without his knowledge or consent. After he became director and president, he was for some time necessarily absent from the State. He attended various meetings of the board, advised with the manager and cashier, examined the books, notes, accounts, bills receivable and payable, and about the middle of August discovered the $10,000 loan of the Canal Company. Thereupon, it appears he required a statement of the affairs of the bank from the manager, and upon receiving the same and making an examination of it, and submitting it to another banker for advice, he, on August 23, 1893, wrote a letter to the manager in which he in effect deplored the condition of

the bank, criticized the manner of making loans, especially to officers of the institution, instancing the $28,000 loan to the former president, stated that no loan should be made to an officer, even with ample security, without the unanimous consent of the board of directors, and maintained that the board should vote on all loans above a certain amount, and that overdrafts should be put in the form of notes. In fact, the letter is such as would naturally come from a discreet business man, and indicates a desire, on the part of the writer, to institute a prudent and diligent administration of the affairs of the institution. The evidence fails to show that the disastrous consequences to the bank, stockholders, and creditors could have been avoided even by the highest degree of care and vigilance after he assumed the duties of office. Under these circumstances the court would not have been warranted in holding him liable, and therefore, as to him, the non-suit was properly granted. We are also of the opinion that the non-suit was properly granted as to defendants Maguire and Perkins. It appears they were elected directors about July, 1893, after all the loans complained of had been made, and the plaintiffs failed to make a *prima facie* showing that the crisis, which came a few months later, was due to any negligence committed by them, or that it could have been averted by any care or vigilance which they could have exercised.

We are further of the opinion that the plaintiff failed to make out a *prima facie* case as to defendant Armstrong, the receiver. The defendant, Robison, it appears, was not properly before the court, hence, his case calls for no consideration from us. Respecting the remaining defendants, the ruling of the court, in granting the nonsuit, presents a much more serious question, under the evidence. As to them, the testimony appears to show a

different state of facts. Defendant Spencer was elected · as a director and member of the executive committee in January, 1892. It was the duty of the executive committee to make and pass on loans. Testifying as a witness, he said that he examined the Corey loan of $28,000, and thought that most of it was made before he was director. He knew that Corey was an officer of the bank, but did not recollect as to any security for the loan. Was aware of the Gillete & Co. transaction, but did not know whether the debt was for loans or overdrafts. He knew what his duties were as a member of the executive committee. The witness said: "The executive committee met every two or three months. I have explained that the loaning was principally entrusted to Robison and Brough. Frequently, when I was in the bank, Robison would ask me what I thought about certain loans. I don't know whether I was an officer of the Junction City Driving Park or not. I was a director, I believe. The Eccles Lumber Company is a corporation. I am a member of that. We attached the Driving Park. I don't know when the loan was made to the Driving Park, or whether they had any personal property at the time or not. We did n't examine the books of the bank very often; we generally looked at the notes and counted the money on hand and looked at the cash book as to the amount they should have. We did not audit the books as a rule; we never examined them."

The witness was on Helfrich's bond, but did not know that he had overdrawn, and said they gave the privilege to overdraw accounts to no one. Matters of loans were generally left with the manager and cashier.

Defendant Murphy became director in 1891, and, as a witness, said: "I know most of the loans complained of in this case. I had nothing to do with them at the time

of the making of the loans. I knew nothing about them at the time. I only know what I have heard since about the condition of the Cache Valley Land and Canal Company transaction, and the loan made to the Cache Valley Land and Canal Company. I didn't pass on the loan at the time it was made or at the time of the renewal.''

Defendant Kuhn assumed the duties of director in January, 1891. As a witness, he, in part said: '' I was one of the executive board of the bank. I don't believe that, as a member of that board I passed upon the Anderson Pressed Brick Co. loan. I was in the bank quite often; I very seldom looked at the books. I had an opportunity of looking at them at any time. I looked at the daily blotter once in a while. During all the time I was a director I was a member of the executive board. I remember that Corey got some money there. I passed upon the loan at the time. I think it was $2,500 that he wanted. I have been in business here sixteen or eighteen years. I have a man to keep our books. I do not understand bookkeeping. I could probably find an account if I took time for it. I knew that the bank was discounting paper and making loans. I knew its general class of business.''

He was aware of the Barbour shortage and other transactions of which complaint is made. The loan, to the Cache Valley Land and Canal Company was made while he was absent from the State. Sometimes he was absent on business two or three months at a time. He heard of and noticed nothing to arouse suspicion, and had confidence in the manager.

So, the defendant Wells, testified: '' I don't know about the Cache Valley note transaction. I never looked it up or had anything to do with it. I never examined the books of the bank, or counted the cash. I remember

when Barbour was accused of being short in his accounts. It was at the time of Robison and Corey's giving their note. I was a director at the time. Robison and Corey told me and gave the directors to understand that they would stand good for that shortage. * * * I was one of the executive board, appointed in 1891. As a member of the board, I did not pass on any of the loans at that time. Nor did any of the board in my presence pass on any loan. I was in some of the meetings. Kuhn, Spencer, and Cahoon were the other members of the committee, I think. When I was a member of the executive board, I never passed on any loans: I left the whole matter to Helfrich and Robison, and delegated my power to them."

On cross-examination the witness said: "I was one of the first directors, and was appointed upon the executive board to pass upon the sufficiency of securities and such as that. I attended meetings and had stock in the bank. We did not have the list of notes, or the note pouch placed upon the table. The books were there, but I never was at a meeting where they examined any of the notes. I knew what my duties were and understood the purpose of my appointment. I knew that the stockholders were looking to me to protect their interests; but I did n't do it. I just let it go by default. I don't suppose the other members of the board were as derelict as I was."

The testimony of defendant Corey is in part, as follows: "I was the first president of the Citizens' Bank. I do not think that J. P. Barbour, the first cashier, gave a bond while acting as such. I did borrow money in March, 1893, and at different times from the bank, while president. I do not remember how much. I did not give any security at that time. Robison passed on the

loan. I do not remember anything about a $3,700 note. I do remember about an indebtedness of mine and the Corey Brothers for $28,000. We borrowed the money from the bank from time to time, and would take up one note and give another one at different times. It might be that I got money on my individual note, I do not remember. We left our bank stock as security. I can not recollect the dates of the notes, but I know that we borrowed for the Company there. I think the aggregate was something like $28,000. The Company failed in the fall of 1892, about October or November. We owed the First National Bank at that time in the neighborhood of $70,000. We gave them good real estate security as far as it went. I did not make any effort to get security for the Citizens' Bank. I did not borrow $8,000 of them after we failed. As president of the bank, I believe I was elected as a director of the Cache Valley Land and Canal Company. I did not know anything about the Canal Company transaction. The truth is I was only nominal president of the bank. I presided at meetings, and every day I was in the city I looked around after the interests of the bank. I was interested in the Junction City Driving Park Association and was president of it. I don't know much about the loans or overdrafts of the Driving Park Association. I don't know whether or not the directors approved of the loans to the A. P. B. Co. I knew in a general way that they were making loans. I did not know anything about the details of the loans at the time they were made. I wasn't manager or anything of that kind. I couldn't tell you how many meetings I presided over. I never missed a meeting while I was in the city, that I know of. Sometimes they held two or three meetings a month, and sometimes one."

The defendant Schramm, another director, gave testi-

mony as follows: " I was a stockholder from the inception of the bank, down to December, 1893.   I was generally at all of the meetings of the directors of the Citizens' Bank.   I could n't say how many meetings I would attend during the year.   I had a very slight acquaintance with Barbour.   The directors requested him to furnish a bond shortly after the bank was organized.   The directors that were meeting at that time were Corey, Robison, Cahoon, Keck, Wurtelle, Robison; I can't think of the others.   I did not make a personal examination of the books of the bank during the administration of Barbour. I knew about the Corey loan when it was made; I can't give you the date.   After they went to the wall, the manager was requested by the directors to get what security he could for the claim.   I did n't know when the $10,000 loan was made to the Canal Co.   I knew nothing at all of the transaction until after it was completed. I can't remember when I first learned of the transaction. I remember Kuhn saying, ' Come over to the bank; there is a loan there we want to consider.'   We went over and told Robison that if there was anything being loaned where the bank would become indebted, we wanted him to fix up security for the bank.   This was sometime in the summer of 1893.   I don't understand the bank style of bookkeeping.   I was one of the executive committee after January, 1893.   I did the best I could as director.   The duties of the executive committee were passing upon the loans and the property, and the general management of the bank.   We did n't consent to any loans after I became one of the executive committee."

The witness knew of the various transactions complained of, and had confidence in the manager and cashier.

The defendant Brough was cashier, and some of his statements in his testimony are as follows: "I was nomi-

nally cashier of the Citizens' Bank. I don't consider that I performed all the duties of a cashier, because there was a manager of the bank. He performed many of the duties that a cashier would perform if there was no manager. I was not selected as manager. I was elected at a board meeting of the directors to act as cashier, on a salary. I consider that when I went into the bank I made a contract with the directors restricting my liability. They made a contract with me that I was not to be charged with responsibility or charged with passing upon securities. That contract was in writing. With it is a proposition from six of the directors asking me to become cashier. I was a member of the Cache Valley Land and Canal Company. I did not make a loan to that company. I did know of a loan being made to the company. Mr. Robison made the loan. I did not know of it until evening came, and we made up our books. I did not find that the cash was $10,000 short. There was a copy of the note that was sent to Chicago, lying among the checks and deposit slips. The note was taken in favor of the bank. I saw the note after it came back from Chicago. Mr. Robison sent it. It was returned on the 12th day of June. It was charged to our account on the eighth day. This was in the year 1893. Prior to the returning of the note from Chicago, no minute entry was made upon the books of the bank, because there was a copy of the note in the pouch.''

When the bank made its assignment, the witness became the assignee.

The evidence presented in the record is quite voluminous, and further reference, in detail, is not deemed necessary. A careful examination of all the proof impels the conclusion that at least some of the transactions, of which the plaintiffs complain, are, to say the least, not

such as discreet business men ought to consummate. The overdrafts and loans to officers, the large loans to individual borrowers, in some instances without security, as shown by the evidence, are of such a character, as ought to have suggested to the directors the depletion of the vaults of the bank and the working of its ruin. Some of the directors, as is indicated by their statements on the witness stand, seem to have acted upon the theory that by the appointment of executive officers in whom they had confidence and who were reputed honest, they discharged their duties as directors; that the burdens and responsibility of management and supervision were then shifted to such officers. As we have seen, such is not the law. The directors were not mere ornaments to the bank to lure public confidence. When they became directors, the law cast upon them the important duties of supervision and direction, which they could not delegate to the executive officers, and therefore the stockholders and depositors had the right to entrust the institution with their money in confidence that the directors would perform those duties. When sued for losses which resulted from careless or unlawful acts, and unfortunate transactions, they can never set up as a defense that they did not examine the books or accounts of the bank, knew nothing about the loans or discounts, were ignorant of banking business, or that they entrusted the management and supervision of the business to the executive officers in whom they had confidence. The welfare of the public and the interests of banking institutions alike forbid this.

Mr. Morawetz, in his Treatise on the Law of Private Corporations, in Section 554, says: "Directors are not merely bound to be honest; they must also be diligent and careful in performing the duties which they have undertaken. They can not excuse imprudence on the

ground of their ignorance or inexperience, or the honesty of their intentions, and if they commit an error of judgment through mere recklessness or want of ordinary prudence and skill, the corporation may hold them responsible for the consequences." *Marshall* v. *Farmers' Savings Bank*, 85 Va., 676.

We do not herein assume to determine the ultimate rights of the plaintiffs. Whether or not they will finally be able to recover, for any of the transactions complained of, will perhaps depend largely upon the question whether or not they themselves have been guilty of such acts and conduct respecting these transactions, and the management of the bank, as will prevent a recovery by them. We simply hold that the plaintiffs have established a *prima facie* case against the defendants Brough, Spencer, Murphy, Kuhn, Wells, Schramm, and Corey; and as to them the judgment of the court must be set aside, costs to abide the result of the action. As to defendants Robison, Maguire, Beeman, Perkins, and Armstrong, the judgment of non-suit is affirmed, with costs against the plaintiffs. The cause must, therefore, be remanded to the court below with directions to proceed in accordance herewith. It is so ordered.

BASKIN, J., and CHERRY, Dist. J, concur.