CHARLES H. KAVANAUGH, Suing in Behalf of Himself and Others, Stockholders of the Commonwealth Trust Company of New York, Appellant, *v.* COMMONWEALTH TRUST COMPANY OF NEW YORK et al., Defendants, and GEORGE J. GOULD, Respondent.

**Banks and banking — directors — duties and liabilities of directors of financial institutions — neglect of director to discover and prevent mismanagement and fraudulent transactions by officers of a trust company — action against such director to recover for losses permitted by his neglect — erroneous refusal of trial court to make findings as to director's negligence.**

1. Directors in financial institutions are summoned to the same degree of care and prudence that men prompted by self-interest generally exercise in their own affairs. They should know of and give direction to the general affairs of the institution and its business policy, and have a general knowledge of the manner in which the business is conducted, the character of the investments and the employment of the resources. No custom or practice can make a directorship a mere position of honor void of responsibility, or cause a name to become a substitute for care and attention. The personnel of a directorate may give confidence and attract custom; it must also afford protection. What a director must do in exercising reasonable care in the performance of his duties is always dependent upon the facts.

2. The respondent, a director of a trust company, has been sued to recover losses sustained by the company through his alleged neglect of duties. By arrangement with him when he became a director he was not expected to attend the meetings or to take active part in the affairs of the company. The respondent testified that he never went near the trust company, knew nothing of its affairs, gave no attention to its business, took no action except to resign. The questions litigated upon the trial were two, the respondent's neglect and the losses attributable thereto. The trial judge found the facts of the transactions but failed to make any finding upon these two questions. Whether respondent in exercising reasonable care would have left such an institution as he was connected with without some scrutiny of its initial investment and supervision of its loans, or without directing

the nature of its business policy, is a question of fact for the trial court.

3. There is no finding either of neglect, that there was not neglect, or that the losses were not due to respondent's neglect. The trial court refused a request to find that respondent was negligent and that losses resulted therefrom; but this is not a finding that he was not negligent or that losses did not result therefrom. A refusal to find a fact requested is not equivalent to an affirmative finding to the contrary, and the failure of the trial court to find upon the issue raised by the pleadings and evidence given upon the trial is a mistrial. A judgment must be based upon the facts found, not facts refused. There is evidence from which a finding might be made of the respondent's neglect, and that losses were attributable thereto. These matters not having been passed upon by the trial judge, there was a mistrial which requires a reversal and a rehearing.

*Kavanaugh* v. *Commonwealth Trust Co.*, 169 App. Div. 905, reversed.

(Argued January 14, 1918; decided March 12, 1918.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered June 29, 1915, affirming a judgment in favor of defendants entered upon a dismissal of the complaint by the court on trial at Special Term.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Edgar T. Brackett* for appellant. The respondent was negligent as a director of the trust company. (*Kendrick* v. *Towle*, 36 Mich. 363; *Kibele* v. *Philadelphia*, 105 Penn. St. 41; *Louisville* v. *Carmon*, 20 Ind. App. 471; *Lehigh* v. *Lear*, 6 Saddler [Penn. St.], 272; *Robinson* v. *Smith*, 3 Paige, 222; *Brinkerhoff* v. *Bostwick*, 88 N. Y. 52; *Hun* v. *Cary*, 82 N. Y. 65; *Cassidy* v. *Uhlmann*, 170 N. Y. 505; *Hanna* v. *Lyon*, 179 N. Y. 107; *Bowers* v. *Male*, 186 N. Y. 28.)

*Lewis E. Carr* and *Rush Taggart* for respondent. There was no evidence of negligence on the part of the defendant Gould. (*Warner* v. *Penoyer*, 91 Fed. Rep. 587; *Witters*

v. *Sowles*, 31 Fed. Rep. 1; *Clews* v. *Bardon*, 36 Fed. Rep. 617; *Percy* v. *Millandon*, 8 Mart. [La.] 32; *Swentzel* v. *Penn. Bank*, 147 Penn. St. 140; *Briggs* v. *Spaulding*, 141 U. S. 132; *Williams* v. *Holland*, 38 N. J. Eq. 373; *Land Credit Co.* v. *Fermoy*, L. R. 5 Ch. App. 763; *North Hudson Mutual B. & L. Assn.*, 82 Wis. 360; *Kellam* v. *Barnes*, 106 Wis. 546; *Hedges* v. *Paquet*, 3 Ore. 372; *Mason* v. *Moore*, 73 Ohio St. 275.)

CRANE, J.  The defendant, a director of a trust company, has been sued to recover losses sustained by the company through his alleged neglect of duties.  The courts below have decided in his favor.  The sufficiency of the complaint was before us in 181 N. Y. 121 and 191 N. Y. 522.  Although a new trial must be had as the trial court failed to pass upon the issues presented by the pleadings, yet, in order to present the matter clearly, a statement of the principal facts involved is necessary.

The Trust Company of the Republic, now the Commonwealth Trust Company, was organized under the Banking Law of the state of New York in March of 1902 with a capital of $1,000,000 and a surplus of $500,000, fully paid.  The respondent, George J. Gould, became a director and qualified April 3, 1902, when he filed his oath with the banking department.  He resigned as such director October 29, 1902.  Within that time the trust company suffered heavy losses from bad management.  Gould never attended the meetings of the directors nor acquainted himself with the business or methods of the trust company.

The law governing the duties of directors in financial institutions is well settled.  They are summoned to the same degree of care and prudence that men prompted by self-interest generally exercise in their own affairs. (*Hun* v. *Cary*, 82 N. Y. 65; *Cassidy* v. *Uhlmann*, 170

N. Y. 505; *Hanna* v. *Lyon*, 179 N. Y. 107, 110; *General Rubber Co.* v. *Benedict*, 215 N. Y. 18; *Campbell* v. *Watson*, 62 N. J. Eq. 396; *Warner* v. *Penoyer*, 91 Fed. Rep. 587.) They should know of and give direction to the general affairs of the institution and its business policy, and have a general knowledge of the manner in which the business is conducted, the character of the investments and the employment of the resources. No custom or practice can make a directorship a mere position of honor void of responsibility, or cause a name to become a substitute for care and attention. The personnel of a directorate may give confidence and attract custom; it must also afford protection.

By arrangement with Mr. Gould when he became a director, he was not expected to attend the meetings or to take active part in the affairs of the company.

Upon the organization of the Trust Company of the Republic, Daniel Le Roy Dresser was elected president. He had been a very successful business man, stood well in the community, but was never a banker. He had never served as a director of a bank.

The by-laws adopted by the stockholders made provision for a board of directors of twenty-five and an executive committee consisting of the president and six other directors elected by the board. The executive committee had the powers of the board when the latter was not in session. For all investments in stocks, bonds, mortgages and personal securities the assent of the executive committee was necessary. The president, however, might be authorized by the executive committee to make investments in such securities without previously consulting it as to details, but all such transactions were to be reported at its next meeting. Tuesday of every week, at the main office of the company, was the meeting time for the executive committee. The directors were required to meet at the same place on the third Tuesday

of every month.   Regular minutes of the executive committee meetings were to be kept and read at the monthly meetings of the board.   They were always to be open to any director.   The president was also required to report the finances, affairs and business of the company at the board meetings.   Copies of the by-laws were given to each director; their sufficiency to properly regulate and control the affairs of the company was yet to be tested by experience.   Dresser, the president, said: " The by-laws were preliminary and experimental, and we were trying to feel our way and find out what was really · best.   They were permanent to the extent of being printed and distributed to the directors."   It was important, especially in a new company, that such by-laws as it did have should be complied with.   When a by-law is adopted, it is as much the law of the corporation as if its provisions had been a part of the charter.   (*Kent* v. *Quicksilver Mining Co.*, 78 N. Y. 159, 179; *Hun* v. *Cary*, 82 N. Y. 65.)

During the period in question, meetings of the board of directors were held on March 27th, April 15th, May 13th, June 17th, July 22d, September 16th and October 21st.   The meeting which should have been held on August 19th, 1902, was passed.   There was no meeting of the executive committee from the 22d day of July until the 9th of September.

Books were kept in which were recorded loans of various kinds and which were taken into the executive committee and board meetings, and were always open for inspection.   The minutes of the executive committee, however, failed to show any loans reported to it or the nature of the securities taken for loans.

The losses sustained by the trust company were largely due to its connection with the United States Shipbuilding Company.   It invested so heavily in the bonds of this company as to bring ruin to the institution but for

the timely interference, in October of 1902 — six months after its organization — of several of its directors.

The United States Shipuilding Company was a project to acquire the plants of the Union Iron Works, San Francisco, California; the Bath Iron Works, Limited, and the Hyde Windlass Company, Bath, Maine; the Crescent Shipyard and the Samuel L. Moore & Sons Co., Elizabeth, N. J.; the Harlan & Hollingsworth Co., Wilmington, Delaware, and the Canda Manufacturing Co., Cartaret, New Jersey. The plan was to combine these plants and bring them into a single company, and it was proposed that such new company should issue $16,000,000 of five per cent gold bonds, secured by the consolidated properties, of which $9,000,000 should be offered to public subscription at not less than 95%. In addition it was proposed that $10,000,000 six per cent accumulative preferred, and $10,000,000 common stock should be issued. The prospectus of this proposition and organization was issued and circulated by the trust company in April of 1902. From this prospectus it appears that the Mercantile Trust Company was to be the trustee for the bonds, and the Trust Company of the Republic, bankers and transfer agents. The underwriters agreed with the Mercantile Trust Company to pay $900 for each $1,000 bond subscribed for by them, twenty-five per cent to be paid upon allotment and the balance upon the demand of the Mercantile Trust Company. All of the $9,000,000 required to organize and float the ship building company was not to be raised in this country; $3,000,000 was to be underwritten in London, $3,000,000 in Paris, and $3,000,000 in New York.

The underwriting agreement provided that with the consent of the Mercantile Trust Company any other concern could be included in the combination. On June 14, 1902, the Trust Company of the Republic advertised

the bonds of the United States Shipbuilding Company as provided for and offered the same for public subscription. Three or four days before the appearance of said advertisement, Dresser, the president of the trust company, and one Lewis Nixon had concluded an agreement to include in the combination the Bethlehem Steel Company, which was to be purchased for $10,000,000 of the preferred and $10,000,000 of the common stock of the shipbuilding company, to which was afterwards added $5,000,000 of the common stock as the promotion expense, of which President Dresser was to get $1,000,000, Mr. Nixon $1,000,000, and the Trust Company of the Republic $1,000,000.

As the following persons and corporations will be mentioned later, it may be well to state their relation to the case. John W. Young was the promoter of the United States Shipbuilding Company. Charles E. Reiss was a partner of Dresser in Dresser & Company, a mercantile establishment. A. H. Engel was an employee of Dresser & Company. The Narrangansett Webbing Company and the American Tubing and Webbing Company were largely owned by Daniel Le Roy Dresser, the president of the trust company.

Beginning with April, 1902, and continuing through May and June, the trust company, through its president, speculated in its own stock, the purchase and sale thereof being carried in an account headed " Advances." This account, kept in the general ledger of the company, showed thirteen purchases in April, thirteen in May, and eight in June. The shares purchased were from 25 to 775, and the amount carried ran as high as $157,673.07. Transactions of this nature continued during every month up to the 13th of October. While there was no loss to the trust company upon these transactions, yet they were forbidden by law. (Banking Law [Cons. Laws, ch. 2], sec. 27, subd. 8; 1 Birdseye,

Cummings & Gilbert's Statutes, p. 327.) No director with knowledge of these transactions should have permitted their continuance. An act does not cease to be illegal because it is profitable.

On April 30, 1902, the trust company loaned the Narrangansett Webbing Company $50,000 upon its note indorsed by G. M. Thurlow. This company, as already stated, was largely owned by Daniel Le Roy Dresser, the president of the trust company.

On June 23, 1902, a loan was made to John W. Young, the promoter, for $700 on his note secured by stock of a company not yet organized, and on the following day he got $5,000 more on his note secured by an order on Lewis Nixon for bonds of the United States Shipbuilding Company.

On June 26th, 1902, $50,000 was loaned to Charles E. Reiss, the partner of President Dresser. The collateral for this loan was $100,000 shipbuilding bonds and stock. A little later, A. H. Engel, an employee of Dresser & Company, was accepted by the trust company as debtor in place of Reiss.

On June 30, 1902, the trust company loaned to Etting and Petersen $800,000 secured by $500,000 of bonds of the shipbuilding company. This was in direct violation of section 25 of the Banking Law, which prohibited any loans on negotiable paper exceeding one-half of the actual paid-in capital stock and surplus of the company. While no loss occurred upon this loan, yet the illegal nature of the transaction was some indication of the president's imprudence and daring.

On June 30, 1902, $100,000 was loaned to A. M. Kidder & Company, a copartnership of which Charles D. Marvin, a director of the trust company, and chairman of the executive committee, was a member. No resolution of the board of directors pursuant to section 27 of the Banking Law, subd. 7, authorized or approved this loan.

On June 23, 1902, the trust company received from John W. Young, the promoter, an order upon Lewis Nixon to pay it for services rendered and to be rendered in the matter of the underwriting of the issue of $9,000,000 of the bonds of the shipbuilding company, $300,000 of the bonds of the company, $800,000 preferred, and $800,000 of the common stock of the same company. The order also authorized the trust company to retain from any amount that should come from the underwriters of the bonds $67,000 in cash, and that the trust company should receive from the proceeds of the sale of the Bethlehem Steel Company $1,000,000 of common stock of the shipbuilding company. This order was accepted by Lewis Nixon, and on June 23d delivered to Dresser, the president of the trust company, who communicated the contents of the same shortly after the 23d of June to all of the directors of the trust company.

On the 12th of July the trust company loaned $2,500 to John W. Young on his note dated June 24th, the proceeds of which were payable to him in Paris and the security for which note was the same as that put up for the loan on June 24th.

On July 21st another loan of $50,000 was made by the trust company to Engel, the employee of Dresser & Company, on the collateral of $100,000 shipbuilding bonds.

In the latter part of June the trust company, under the direction of the president, made two fictitious loans, one for $75,000 on a note of A. M. Comacho, a clerk of Lewis Nixon, and another of $70,000 on a note of J. M. Bonner, a clerk of the trust company. These loans were entered and carried upon the books of the trust company and were shown in its semi-annual report of July 1, 1902, to the banking department as good assets. They were taken and carried for the purpose of hiding the amounts paid the trust company by John W. Young for its services as underwriter.

A directors' meeting of this trust company was held July 22, 1902. Either the minutes of the executive committee showed these transactions or did not show them. In either case the result was the same. If it showed them, it was apparent the law had been violated; if it failed to show the loans and investments the by-laws had not been complied with. Dresser testified that all the loans were reported to the board of directors. He says: " We had a book there which showed all of our loans. It was there at all the meetings. It was all of the time loans at both offices that were reported at each meeting."

A jury might find that a director reasonably attentive to his company's affairs, by July 22d should have had some knowledge of these transactions of the president. If Dresser's testimony be true, the directors present at the meetings knew of all or some of these loans and transactions. If the president made no report of the loans, and the minutes of the executive committee did not show them, the directors present at the meetings at least knew of such omissions. They did know all about the shipbuilding company, that it was in the process of formation and had not yet been organized or completed, that its securities were in the form of underwriting agreements for bonds to be issued, and that its success as a financial undertaking depended upon the amount of the subscriptions; they also knew that the trust company was to be paid a commission for underwriting or procuring the underwriting of the bonds. This court has held that the authority to buy and sell stocks and bonds does not authorize a trust company to indulge in hazardous promoting schemes although it may hope from the successful launching of such schemes to make large commissions and receive large bonuses. (*Gause* v. *Commonwealth Trust Co.*, 196 N. Y. 134.)

As all these matters, therefore, were known or should

have been known to the directors present at the monthly meetings up to and including July 22, 1902, would they not also have been known to Mr. Gould if he had attended the meetings or had been reasonably attentive to his duties as a director? This, we think, presents a question of fact. And if, as a director, he knew of these facts and circumstances, would he have been justified in permitting the president to continue in his course unchecked or further loans on the underwritings without supervision and control?

It is frequently stated in the evidence that the trust company was not to become financially involved with the shipbuilding company. Marvin, a director, says that he was unwilling to agree to the trust company taking any interest in the underwriting " as I thought we were a young company and should pursue a very conservative course." And yet according to Director Wetmore's testimony no curb or check of any sort was placed upon Mr. Dresser's control of the company.

What a director must do in exercising reasonable care in the performance of his duties is always dependent upon the facts. Care is a relative term. This Trust Company of the Republic was of recent origin; its business had not become established or its methods fixed. Its president was a merchant with apparently no banking experience. Whether a director in exercising reasonable care would have left such an institution without some scrutiny of its initial investments or supervision of its loans, or without directing the nature of its business policy, is a question of fact for the trial court.

The directors could, at least, have required the approval of the executive committee before money was advanced upon shipbuilding collateral.

Yet the directors did nothing, and Dresser went his own way.

J. G. White & Company and E. G. Bruckman had each subscribed to $200,000 of the shipbuilding bonds. Dresser had made a secret agreement with them whereby the trust company was to advance 75% of the amount of their subscriptions and look to the bonds for payment, not to their notes. This arrangement was not known to the directors and could not have been discovered from the books, but it did appear that on July 24th the trust company loaned to J. G. White & Company $37,500 on its note secured by shipbuilding bonds; on July 25th, to E. G. Bruckman $90,000 secured by his note and shipbuilding bonds; on August 1st, J. G. White & Company $33,750 again secured by note and bonds of the shipbuilding company, and again on August 29th, to J. G. White & Company $28,500 secured in like manner. Some check or restraint upon the president might have revealed the secret agreement and stayed the loans. There was no reason for these subscribers to keep it secret.

These amounts were advanced to Bruckman and to White in response to calls made by the Mercantile Trust Company for payment upon their subscriptions. The moneys were not paid to them but passed to the ship-building account.

The daily deposits in the hands of the trust company amounted from a million to about two millions of dollars.

The shipbuilding deal was to be consummated on August 11th, at which time the properties of the various companies were to be taken over and paid for. On August 12th, the Bethlehem Steel Company deal was to be carried through. As the time approached the money was not forthcoming. The underwriting had failed in London and in Paris, but the interests of the trust company in the shipbuilding venture were of such an extent that severe losses would ensue if the enterprise dropped through.

On August 11th four loans were made by the trust company as follows: To A. Caldwell, president of the American Tubing & Webbing Company, a corporation controlled by Dresser, $75,000; to Charles E. Reiss, heretofore mentioned, $75,000; to G. M. Thurlow, treasurer of the American Tubing & Webbing Company, $75,000, and to A. H. Engel, heretofore mentioned, $6,000 — total $231,000. The notes taken for these loans were upon regular printed forms of collateral note in use by the trust company, but no collateral was expressed. Upon the envelopes containing them, however, appeared " 150 M. U. S. Ship Building 5's, 375 common, 375 preferred, 50% paid." These four men were accommodation makers for the trust company — " nominees of the trust company." The amount of $231,000 was passed to the shipbuilding account.

On the same day the trust company, under the direction of Dresser, made a loan to Lewis Nixon of $700,000 with a collateral of $900,000 of the shipbuilding company's bonds and stock; and on the next day, August 12th, made a similar loan of $1,922,187.50, and in the first week of September loans were obtained from various banks upon the guaranty of the trust company, again by Dresser, which loans passed into the shipbuilding account, making a total of loans and guarantees of the Trust Company of the Republic made for the benefit of the United States Shipbuilding Company of over $4,100,000. Thus, inside of six months, the entire capital, surplus and deposits of the trust company were turned into a promotion scheme.

When, in October, W. A. Bailey and Wheeler & Jones were called upon to pay their subscriptions, $12,000 was loaned to each of these parties to meet their obligations. The security was shipbuilding bonds.

Through an investigation conducted by some of the directors in late September, all these facts were revealed

and the Sheldon syndicate formed, whereby the company was relieved of its principal bond holdings and its ruin prevented. But some of the loans were not thus provided for, and losses occurred.

Upon a reorganization of the shipbuilding company, the details of which need not be stated, the bonds held as collateral by the trust company were worth but $176 each. The loans to White & Company, E. G. Bruckman, A. Caldwell, C. E. Reiss, August 11th, G. M. Thurlow, August 11th, A. H. Engel, August 11th, W. A. Bailey and Wheeler & Jones were almost a complete loss.

We do not say as matter of law that the defendant Gould was negligent or that his negligence caused the above losses, but we do say that it is a question of fact whether, as a director, he should have known, by the July 22d meeting, something of the company's affairs and the transactions and methods of its president, and whether, upon the evidence and under the conditions above stated, he should have, in the exercise of reasonable care, done something to prevent the continuance of such methods and further loans on shipbuilding bonds without a check or supervision. It is also a question of fact whether the above losses may not be attributed to such inattention. (*People* v. *Equitable Life Assurance Society of U. S.*, 124 App. Div. 714, 731.)

On September 25th the president took $35,000 in cash from the company. This was without authority. That the president at such a time in the company's affairs could take such a large sum of money for his own purposes without procuring the authority or direction of the executive committee or the board of directors or the consent of any other officer, in the opinion of some of my associates, classes this loss with those above mentioned. That is, a similar question is presented as to whether or not a reasonable attention to the affairs

of the company would not have required such methods as to prevent a loss of this kind.

The defendant Gould testified that he never went near the trust company, knew nothing of its affairs, gave no attention to its business, took no action except to resign. There is, therefore, evidence of his neglect, and evidence that his neglect may have resulted in the losses specified, which required the trial court to determine these matters. As the case now comes before us, there have been no findings whatever upon these cardinal issues of the case. The questions litigated upon the trial were two, the defendant's neglect and the losses attributable thereto. In making his decision, the trial judge found the facts of the transactions but failed to make any finding upon these two questions. There is no finding of neglect, neither is there a finding that there was no neglect; likewise, there is no finding that the losses were not due to Mr. Gould's neglect. It is true that the trial court refused a request to find that Gould was negligent and that losses resulted therefrom, but this is not a finding that he was not negligent or that losses did not result therefrom.

A refusal to find a fact requested is not equivalent to an affirmative finding to the contrary, and the failure of the trial court to find upon the issue raised by the pleadings and evidence given upon the trial is a mistrial. A judgment must be based upon facts found, not facts refused. (*Morehouse* v. *Brooklyn H. R. R. Co.*, 185 N. Y. 520; *Dougherty* v. *Lion Fire Ins. Co.*, 183 N. Y. 302; *Alcock* v. *Davitt*, 179 N. Y. 9.)

In conclusion, therefore, we state that there was evidence in this case from which a finding might be made of Gould's neglect, and that losses were attributable thereto. These matters not having been passed upon by the trial judge, there has been a mistrial which requires a reversal and a rehearing.

The judgment of the Appellate Division should be reversed, and new trial ordered, with costs to abide the event.

HISCOCK, Ch. J., CHASE, COLLIN, CUDDEBACK, HOGAN and McLAUGHLIN, JJ., concur.

Judgment reversed, etc.