## BARNES v. ANDREWS.

### (District Court, S. D. New York. March 7, 1924.)

1. Corporations ⟨⟩310(1)—Duty of director to keep himself informed of conduct of business.

    A director of a corporation is not expected nor required to individually interfere in management by the officers, but it is his duty to keep himself informed in some detail of its affairs and the conduct of its business.

2. Corporations ⟨⟩312(1)—Director held chargeable with misprision or neglect of duty.

    A director, who, during his incumbency of about eight months, at a time when the corporation was preparing for active business, attended one of the two directors' meetings, having a valid excuse for absence from the other, but aside from that had no knowledge of its affairs, except that gained from general talks with the president, and during the time a large amount of money was wasted through incompetent management and disagreements between the officers, held chargeable with misprision.

3. Corporations ⟨⟩310(2), 319(7)—Director cannot be charged with general liability for losses, because of neglect of duties, and burden on receiver to show facts as to culpability.

    A director cannot be held liable generally for collapse of the business of the corporation, because of inattention to its affairs; but some specific loss must be shown, which would have been avoided, if he had been reasonably diligent in performance of his duty, and the burden of proving such facts rests on a receiver, suing therefor.

4. Corporations ⟨⟩310(1)—A director does not warrant his special fitness.

    Directors are not specialists, but only general advisers of the business, and a corporation which has chosen a director cannot charge him with general liability for losses, because of his lack of business knowledge or experience.

5. Corporations ⟨⟩317(3)—Corporation cannot hold director liable for a fraudulent act from which it profited.

    Neither a corporation nor its receiver may charge a director with liability for an alleged illegal or fraudulent expenditure, which resulted in no loss to the corporation, but from which it received and retained a profit.

In Equity. Suit by Earl B. Barnes, as receiver of the Liberty Starters Corporation, against Charles Lee Andrews. Decree for defendant.

Final hearing on a bill in equity, under section 91-a of the General Corporation Law of New York (Consol. Laws, c. 23), to hold liable the defendant as director for misprision of office. The corporation was organized under the laws of that state to manufacture starters for Ford motors and aeroplanes. On October 9, 1919, about a year after its organization, the defendant took office as a director, and served until he resigned on June 21, 1920. During

---

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

that period over $500,000 was raised by the sales of stock of the company, made through an agent working on commission. A force of officers and employees was hired at substantial salaries, and the factory, already erected when the defendant took office, was equipped with machinery. Starter parts were made in quantity, but delays were experienced in the production of starters as a whole, and the funds of the company were steadily depleted by the running charges.

After the defendant resigned, the company continued business until the spring of 1921, when the plaintiff was appointed receiver, found the company without funds, and realized only a small amount on the sale of its assets. During the incumbency of the defendant there had been only two meetings of directors, one of which (i. e., that of October 9, 1919) he attended; the other happening at a day when he was forced to be absent because of his mother's death. He was a friend of the president, who had induced him as the largest stockholder to become a director, and his only attention to the affairs of the company consisted of talks with the president as they met from time to time.

The theory of the bill was that the defendant had failed to give adequate attention to the affairs of the company, which had been conducted incompetently and without regard to the waste in salaries during the period before production was possible. This period was unduly prolonged by the incompetence of the factory manager, and disagreements between him and the engineer, upon whose patents the company depended. The officers were unable to induce these men to compose their differences, and the work languished from incompetence and extravagance. More money was paid the engineer than his royalty contracts justified, and money was spent upon fraudulent circulars to induce the purchase of stock.

George W. Alger and Brainard Avery, both of New York City, for plaintiff.

George Gordon Battle and Origen S. Seymour, both of New York City, for defendant.

LEARNED HAND, District Judge (after stating the facts as above). This cause may be divided into three parts: First, the defendant's general liability for the collapse of the enterprise; second, his specific liability for overpayments made to Delano; third, his specific liability for the expenses of printing pamphlets and circulars used in selling the corporate shares.

[1] The first liability must rest upon the defendant's general inattention to his duties as a director. He cannot be charged with neglect in attending directors' meetings, because there were only two during his incumbency, and of these he was present at one and had an adequate excuse for his absence from the other. His liability must therefore depend upon his failure in general to keep advised of the conduct of the corporate affairs. The measure of a director's duties in this regard is uncertain; the courts contenting themselves with vague declarations, such as that a director must give reasonable attention to the corporate business. While directors are collectively the managers of the company, they are not expected to interfere individually in the actual conduct of its affairs. To do so would disturb the authority of the officers and destroy their individual responsibility, without which no proper discipline is possible. To them must be left the initiative and the immediate direction of the business; the directors can act individually only by counsel and advice to them. Yet they have an individual duty to keep themselves informed in some detail, and it is this duty which the defendant in my judgment failed adequately to perform.

[2] All he did was to talk with Maynard as they met, while commuting from Flushing, or at their homes. That, indeed, might be enough, because Andrews had no reason to suspect Maynard's candor, nor has any reason to question it been yet disclosed. But it is plain that he did not press him for details, as he should. It is not enough to content oneself with general answers that the business looks promising and that all seems prosperous. Andrews was bound, certainly as the months wore on, to inform himself of what was going on with some particularity, and, if he had done so, he would have learned that there were delays in getting into production which were putting the enterprise in most serious peril. It is entirely clear from his letters of April 14, 1920, and June 21, 1920, that he had made no effort to keep advised of the actual conduct of the corporate affairs, but had allowed himself to be carried along as a figurehead, in complete reliance upon Maynard. In spite of his own substantial investment in the company, which I must assume was as dear to him as it would be to other men, his position required of him more than this. Having accepted a post of confidence, he was charged with an active duty to learn whether the company was moving to production, and why it was not, and to consider, as best he might, what could be done to avoid the conflicts among the personnel, or their incompetence, which was slowly bleeding it to death.

[3] Therefore I cannot acquit Andrews of misprision in his office, though his integrity is unquestioned. The plaintiff must, however, go further than to show that he should have been more active in his duties. This cause of action rests upon a tort, as much though it be a tort of omission as though it had rested upon a positive act. The plaintiff must accept the burden of showing that the performance of the defendant's duties would have avoided loss, and what loss it would have avoided. I pressed Mr. Alger to show me a case in which the courts have held that a director could be charged generally with the collapse of a business in respect of which he had been inattentive, and I am not aware that he has found one. In Bowerman v. Hammer, 250 U. S. 504, 39 Sup. Ct. 549, 63 L. Ed. 1113, the defendant was held for specific illegal loans, made by the president; so also in Kavanaugh v. Commonwealth Trust Co., 223 N. Y. 103, 119 N. E. 237. In Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662, a case decided by a narrow margin, which to-day would probably have gone the other way, the only attempt to charge the defendant was upon specific loans. Even in Hun v. Cary, 82 N. Y. 65, 37 Am. Rep. 546, it was for a single foolish investment that the defendant was held. The report of Allen v. Roydhouse (D. C. E. D. Pa.) 232 Fed. 1010, is not full enough to ascertain just what the verdict included, but apparently it, too, was for specific losses due to improper investments, and the same was true in Robinson v. Smith, 3 Paige (N. Y.) 222, 24 Am. Dec. 212.

When the corporate funds have been illegally lent, it is a fair inference that a protest would have stopped the loan, and that the director's neglect caused the loss. But when a business fails from general mismanagement, business incapacity, or bad judgment, how is it possible to say that a single director could have made the company

successful, or how much in dollars he could have saved? Before this cause can go to a master, the plaintiff must show that, had Andrews done his full duty, he could have made the company prosper, or at least could have broken its fall. He must show what sum he could have saved the company. Neither of these has he made any effort to do.

The defendant is not subject to the burden of proving that the loss would have happened, whether he had done his duty or not. If he were, it would come to this: That, if a director were once shown slack in his duties, he would stand charged prima facie with the difference between the corporate treasury as it was, and as it would be, judged by a hypothetical standard of success. How could such a standard be determined? How could any one guess how far a director's skill and judgment would have prevailed upon his fellows, and what would have been the ultimate fate of the business, if they had? How is it possible to set any measure of liability, or to tell what he would have contributed to the event? Men's fortunes may not be subjected to such uncertain and speculative conjectures. It is hard to see how there can be any remedy, except one can put one's finger on a definite loss and say with reasonable assurance that protest would have deterred, or counsel persuaded, the managers who caused it. No men of sense would take the office, if the law imposed upon them a guaranty of the general success of their companies as a penalty for any negligence.

It is, indeed, hard to determine just what went wrong in the management of this company. Any conclusion is little better than a guess. Still some discussion of the facts is necessary, and I shall discuss them. The claim that there were too many general employees turned out to be true, but, so far as I can see, only because of the delay in turning out the finished product. Had the factory gone into production in the spring of 1920, I cannot say, and the plaintiff cannot prove, that the selling department would have been prematurely or extravagantly organized. The expense of the stock sales was apparently not undue, and in any event Andrews was helpless to prevent it, because he found the contract an existing obligation of the company. So far as I can judge, the company had a fair chance of life, if the factory could have begun to turn out starters at the time expected. Whether this was the fault of Delano, as I suspect, is now too uncertain to say. It seems to me to make no difference in the result whether Delano, through inattention, or through sickness, or through contempt for Taylor, or for all these reasons, did not send along "Van Dycks," or whether Taylor should have got along without them, or should have shown more initiative and competence than he did. Between them the production lagged, until it was too late to resuscitate the dying company; its funds had oozed out in fixed payments, till there was nothing left with which to continue the business.

Suppose I charge Andrews with a complete knowledge of all that we have now learned. What action should he have taken, and how can I say that it would have stopped the losses? The plaintiff gives no definite answer to that question. Certainly he had no right to interject himself personally into the tangle; that was for Maynard to unravel. He would scarcely have helped to a solution by adding another cook to the broth. What suggestion could he have made to

Maynard, or to his colleagues? The trouble arose either from an indifferent engineer, on whom the company was entirely dependent, or from an incompetent factory manager, who should have been discharged, or because the executives were themselves inefficient. Is Andrews to be charged for not insisting upon Taylor's discharge, or for not suggesting it? Suppose he did suggest it; have I the slightest reason for saying that the directors would have discharged him? · Or, had they discharged him, is it certain that a substitute employed in medias res would have speeded up production? Was there not as a fair chance that Delano and Taylor might be brought to an accommodation as there was in putting in a green man at that juncture? How can I, sitting here, lay it down that Andrews' intervention would have brought order out of this chaos, or how can I measure in dollars the losses he would have saved? Or am I to hold Andrews because he did not move to discharge Maynard? How can I know that a better man was available? It is easy to say that he should have done something, but that will not serve to harness upon him the whole loss, nor is it the equivalent of saying that, had he acted, the company would now flourish.

True, he was not very well-suited by experience for the job he had undertaken, but I cannot hold him on that account. After all, it is the same corporation that chose him which now seeks to charge him. I cannot agree with the language of Hun v. Cary, supra, that in effect he gave an implied warranty of any special fitness. Directors are not specialists, like lawyers or doctors. They must have good sense, perhaps they must have acquaintance with affairs; but they need not—indeed, perhaps they should not—have any technical talent. They are the general advisers of the business, and if they faithfully give such ability as they have to their charge, it would not be lawful to hold them liable. Must a director guarantee that his judgment is good? Can shareholders call him to account for deficiencies which their votes assured him did not disqualify him for his office? While he may not have been the Cromwell for that Civil War, Andrews did not engage to play any such rôle. .

I conclude, therefore, as to this first claim that there is no evidence that the defendant's neglect caused any losses to the company, and that, if there were, that loss cannot be ascertained.

The second question is of the defendant's responsibility for overpayments to Delano. This was not an item in the bill of particulars, and was not specifically put forward at the trial. If the defendant is to be held upon it, he will be entitled to have it formally presented, if he chooses. Since I think that the charge is not proved, I may, however, dispose of it now. I shall, for the sake of argument, assume that he would be chargeable with any sums shown to have been paid to Delano in excess of his right under the contracts with him. The facts are as follows:

On August 20, 1918, Delano contracted with Stickels, who later assigned his contract to the company, to give him an exclusive license on Delano's patent for a Ford starter over the United States and Canada, for which Stickels was to pay him certain royalties, with a yearly minimum of $15,000, payable quarterly in advance. In the

same contract Delano also gave Stickels an exclusive license on his patent for an aeroplane starter at a unit royalty, within initial payment of $15,000, should the government give "satisfactory assurance" that a contract with it was "to be had." In addition, Delano was to have a yearly salary of $2,500 as consulting engineer of the company and $25 a day while acting as such. By a supplemental contract, executed the same day, it was agreed that Delano might cancel the aeroplane license, if in any year the company did not make 1,000 starters. On September 26, 1918, Stickels announced that he was satisfied that he could get the proper government contracts, and the second license went into effect.

The company's yearly engagements were, therefore, $15,000 "dead rent" on the Ford license, and an obligation to manufacture 1,000 aeroplane starters per annum. As the company never made any, Delano was free to cancel that license at any time after January 1, 1920, though not before.. It is not clear from the evidence just what was done at that date, nor does it appear whether Delano had earlier received the initial aeroplane payment of $15,000. From the correspondence between him and Stickels of January 27 and 29, 1920, I gather that they had paid him $25,000 during January, thus treating the payment of royalties on 1,000 starters as an equivalent of their actual manufacture. That payment they agreed was to cover the year 1920 as well.

The books show payments of $36,500, to Delano for royalties between October 1, 1919, and June 21, 1920, and it is with these that the plaintiff would charge the defendant. If the payment in January, 1920, for the aeroplane license, was, as I infer, $25,000, then the total of royalties paid is substantially accounted for by the known obligations of the company. Three payments, of $3,750 each, on the Ford license, fell due on October 1, 1919, January 1, 1920, and April 1, 1920, making $11,250. Thus the record shows no excess payments with which on any theory the defendant could be charged, except on the theory that the company should have allowed Delano to cancel the aeroplane license. That, however, was in the first place a matter of judgment, in which, had he known it, the defendant might without liability have concurred with his fellows, and, in the second, was a question on which I should have no right to assume that his persuasion would have been effective. In judging the decision to hold the license, I should remember that under the modification of January, 1920, it covered another year. Who shall say that that was beyond the limits of reasonable decision? As to this branch of the claim the bill must on this record be dismissed; but if, after what I have said, the plaintiff still wishes to amend and raise the claim regularly, I will leave the question of amendment open for further decision.

[5] The last question is of the amounts paid out for printing the circulars used to sell stock. There are three answers to this claim: First, that it resulted in no loss to the company; second, that Andrews was not responsible for the supposedly false statements in the circulars; and, third, that the charge is not within the pleadings.

. First, it was by virtue of these pamphlets that the company got all its money. However unlawful the means, they succeeded, and the treasury was better off than it would have been without the disbursement.

How, then, can the corporation charge a director, while it holds or has enjoyed the fruits of the wrong? The supposedly defrauded stock-holders might have rescinded their contracts and recovered their payments. In that case the disbursement would be a loss, and all directors who had participated in it, or should have stopped it, would be liable; but, since any such recovery is now impossible, it cannot be said that the plaintiff has suffered. The question becomes at once clear, if we substitute for a corporation an individual principal, who should have innocently used the money fraudulently obtained by his agent. He has suffered no pecuniary loss till he repays the victim, or at least till he is sued. The disbursement may have been a wrong to the company, but no damage followed it, and without damage there can be no recovery.

Second, I do not think that Andrews is to be charged with such detail of supervision as was involved in going over the circulars personally. True, I have held him accountable for not acquainting himself with the conduct of the business more intimately than he did; but there is a limit. It seems to me too much to say that he must read the circulars sent out to prospective purchasers and test them against the facts. That was a matter he might properly leave to the officers charged with that duty. He might assume that those who prepared them would not make them fraudulent. To hold otherwise is practically to charge him with detailed supervision of the business, which, consistently carried out, would have taken most of his time. If a director must go so far as that, there will be no directors.

It is argued that he had actual notice of the circulars, because copies were sent to him, as to all other stockholders. That, indeed, gave him an opportunity to learn the facts; but it did not charge him with any duty which had not theretofore existed. It might prove that he did know of the frauds, but that is all. No such proof was made.

Finally, if the plaintiff had meant to proceed on any such theory, the bill must have alleged it. As in respect of the claim for overpayments to Delano, this record does not allow any relief and the bill must be dismissed. As for amendments, the time will come to pass upon them when leave is asked to make them.

Bill dismissed, without costs.