MARCUS T. HUN, as Receiver, etc., Respondent and Appellant, *v.* JOHN G. CARY et al., Appellants; PHILIP SMITH, Respondent.

The relation between a savings bank and its trustees or directors is that of principal and agent, and that between the trustees and depositors is similar to that of trustee and *cestui que trust.*

If such trustees transcend the limits placed upon their power in the charter of the bank and cause damage to the bank or its depositors, they are liable.

They are also bound to exercise care and prudence in the execution of their trust, in the same degree that men of common prudence ordinarily exercise in their own affairs.

Where loss is occasioned by the failure of a trustee to exercise ordinary care and judgment, he cannot excuse himself by claiming that he did not

possess them; by voluntarily taking the position, he undertakes that he does possess and will exercise them, and it is immaterial that the services are rendered gratuitously.

Defendants were trustees of the C. P. Savings Bank, which was incorporated in 1867; up to January, 1873, its average deposits were about $70,000, and its expenses had exceeded its income. In May of that year, by action of the board of trustees, the bank purchased a lot at a cost of $29,250, $10,000 of the purchase-money being paid in cash; the bank covenanting to erect a building thereon to cost not less than $25,000. Upon the lot the bank erected a building for a banking-house, at a cost of about $27,000, and gave a mortgage thereon for $30,500. The object of the purchase and building was to improve the financial condition of the bank by increasing its deposits. The bank failed in 1875. The lot and buildings, and other property which produced less than $1,000, constituted all of its assets; the real estate was swept away by foreclosure of the mortgage. At the time of the purchase the bank occupied leased rooms; its assets were insufficient by several thousand dollars to pay its debts, which fact was known to the trustees. By the charter of the bank (chap. 294, Laws of 1868), it had power to purchase a lot for a banking-house, requisite for the transaction of its business. In an action brought by the receiver of the bank against the trustees, for damages caused by alleged improper investment of its funds, *held,* that the facts justified a finding that the case was not one of mere error or mistake of judgment on the part of the trustees, but of improvidence and reckless extravagance; and that they were properly held liable.

Also, *held,* that as the only relief asked was a money judgment, the action was properly tried as an action at law by a jury.

Also, *held,* that plaintiff was not required to join all the trustees as defendants.

Two of the defendants, after the commencement of the action, filed petitions for their discharge in bankruptcy and were discharged before judgment. *Held* that such a discharge was not a defense to the action, as the claim, being for unliquidated damages occasioned by a tort, was not provable in bankruptcy and therefore not discharged.

(Argued June 14, 1880; decided September 21, 1880.)

THESE were cross-appeals. The defendants, Cary and others appealed from judgment of the General Term of the Supreme Court, in the first judicial department, affirming, as to them, a judgment in favor of plaintiff entered upon a verdict, and affirming an order denying a motion for a new trial. The plaintiff appealed from an order of said General Term reversing its judgment as to defendant Smith, and granting a new trial.

The nature of the action and the facts appear sufficiently in the opinion.

*E. Ellery Anderson* for appellants.    To establish a *prima facie* case of negligence, it is not sufficient for the plaintiff to prove that he has suffered a loss by some event which has happened by the act or omission of the defendant.    He must also prove that the defendant, in such act or omission, violated a duty resting on him. (*Sheldon* v. *The H. R. R. Co.*, 14 N. Y. 218–224; *Losee* v. *Buchanan*, 51 id. 476, 489; *Curtis* v. *Rochester & Syr. R. Co.*, 18 id. 534; *Cleveland* v. *N. J. Steamboat Co.*, 68 id. 366; *Weitner* v. *Del. & Hud. C. Co.*, 4 Robt. 234; Shearman & Redfield on Negligence, §§ 12 and 429.)   Trustees are not liable for loss resulting from errors of judgment made in the discharge of their duties. (*Scott* v. *De Peyster*, 1 Edw. Ch. 513; *Spering's Appeal*, 71 Penn. St. 11; *Miller* v. *Proctor*, 20 Ohio St. 442; *Gould* v. *Branch Bk. of Mobile*, 11 Ala. 191; *Hodges* v. *N. E. Screw Co.*, 1 R. I. 312; *Harmon* v. *Tappenden*, 1 East, 555; *Overend* v. *Gurney*, 4 Ch. App. 701; Green's Brice's Ultra Vires, note, 407, 408; *Overend* v. *Gibb*, 5 H. of L. R. 480, 494; Field on Corp. 183, 184, 186; Angell & Ames on Corp., § 314; *Hinley* v. *Merriman*, 39 Tex. 56, 62; *Ellig* v. *Naglee*, 9 Cal. 683, 695; *Salter* v. *Salter*, 6 Bush [Ky.], 638; *Cross* v. *Petree*, 10 B. Monroe, 413; Perry on Trusts, § 276; *Thompson* v. *Brown*, 4 Johns. Ch. 619, 627; *Knight* v. *Earl of Plymouth*, 3 Atk. 480; Dickens, 120; *Manhattan Bk.* v. *Lydig*, 4 Johns. 347; *Clark* v. *Anderson*, 13 Bush [Ky.], 111–117; *Griffith* v. *Follett*, 20 Barb. 620, 634; *Kavanagh* v. *City of Brooklyn*, 38 id. 237; *Vanderheyden* v. *Young*, 11 Johns. 150, 157, *158; *Williams* v. *Weaver*, 75 N. Y. 30, 33; *Lange* v. *Benedict*, 73 id. 12; *Hawley* v. *James*, 5 Paige's Ch. 318; Perry on Trusts, § 511; Tiffany & Bullard on Trusts and Trustees, 739; Lewin on Trusts, *338, 449 *et seq.;* Hill. on Trustees, *488, 764; *Roosevelt* v. *Roosevelt*, 64 N. Y. 651; 6 Hun, 35, 42, 43.) The court erred in charging that as defendants, as trustees, acted gratuitously, that did not in any way diminish or affect their

liability, and also in excluding the evidence offered to show that the trustees received no compensation. (*Litchfield* v. *White,* 7 N. Y. 438, 444; Story's Equity Jurisprudence, § 1268; *First Nat. Bk.* v. *The Ocean Nat. Bk.*, 60 N. Y. 278–294; 2 Leading Cases in Equity, Part 1, p. 228; *Clark* v. *Anderson,* 10 Bush [Ky.], 108.)

*Francis C. Barlow* for respondent. Agents, directors or trustees are liable to their principals when they do acts outside of their instructions or powers, or when acting within their powers they are careless and negligent. (*Ackerman* v. *Emott,* 4 Barb. 626, 645, 646; *Cloud* v. *Bond,* 3 Mylne & Craig, 490, 496; *Ringold* v. *Ringold,* 1 Harris & Gill [Md.], 25; *King* v. *Talbot,* 40 N. Y. 76; *Overend* v. *Gibbs,* L. R., 5 Eng. and Irish App. 480, 494; *Spering's Appeal,* 71 Penn. St. 11.) That the trustees acted gratuitously does not relieve them from liability. (*Charitable Corporation* v. *Sutton,* 2 Atk. 405; *Litchfield* v. *White,* 3 Sandf. 551; *Donaldson* v. *Holdane,* 7 Cl. & Fin. 771; *Thorne* v. *Deas,* 4 Johns. 84, 96, 97; *Spering's Appeal,* 71 Penn. St. 11, 21; *Giblin* v. *McMullen,* L. R., 2 Privy Council Cases, 318, 337; *First Nat. Bk.* v. *Ocean Bk.,* 60 N. Y. 295; *Grill* v. *S. S. Co.,* L. R., 1 C. P. 612; *Beal* v. *R. R. Co.,* 3 Hurlst. & Colt. 341; *Nolton* v. *R. R. Co.,* 15 N. Y. 449; *Wilson* v. *Brett,* 11 M. & W. 113, 115.) Where trustees invest illegally, the theory of the law is that they are using their own money, and they are bound to restore the money of their *cestui que trust, in solido.* (*Adair* v. *Brimmer,* 74 N. Y. 553; *London & Birmingham R. R. Co.,* 5 De Gex & Smales, 414.) A trustee may not escape responsibility by simply staying away from meetings, or may not acquiesce with impunity because an act has been done. (*Arthur* v. *Griswold,* 54 N. Y. 400–406; *Land Credit Co.* v. *Fermoy,* L. R., 8 Equity, 11, 12; *Bk. Com'rs* v. *Bk. of Buffalo,* 6 Paige, 503; Angell & Ames on Corp., § 312; *Robinson* v. *Smith,* 3 Paige, 232; *Scott* v. *Depeyster,* 1 Edw. Ch. 513; *Butts* v. *Wood,* 38 Barb. 189; *Bliss* v. *Matteson,* 45 N. Y. 26;

*Van Houten* v. *First Church,* 17 N. J. Eq. 132; 3 R. S. [N. Y., 6th ed.] 747, § 46; *Ex parte Brown,* 19 Beav. 104; *Robinson* v. *Beall,* 20 Ga. 303, 304; ·*Soc. of Shakers* v. *Underwood,* 9 Bush [Ky.], 621; *Gillet* v. *Phillips,* 13 N. Y. 117; *Lefevre* v. *Lefevre,* 30 id. 31; *Marsh* v. *Savings Fund,* 5 Phila. 31; *Weetjen* v. *Vibbard,* 5 Hun, ·265, 267; *McCubbin* v. *Cromwell,* 7 Gill. & Johns. [Md.] 168; *Laroe* v. *Douglas,* 13 N. J. Ch.        ; 2 Beasley, 308, 312, 313; 2 Story's Eq., §§ 1275, 1280, 1283; *Crane* v. *Hearn,* 26 N. J. Eq.        ; 11 C. E. Green, 378; *Oliver* v. *Court,* 8 Price, 166; *Liquidators, etc.,* v. *Douglas,* 11 Sessions Cases [3d series], 11, 12; *Lingard* v. *Bromley,* 1 Vesey & Beame, 117.) The general rule that trustees are not liable for the acts and defaults of co-trustees has no application here. (*Brice* v. *Stokes,* 11 Vesey, 324; *Townley* v. *Sherborne,* Cro. Car. 312; *Joy* v. *Campbell,* 1 Sch. & Lef. 341; *Monell* v. *Monell,* 5 Johns. Ch. 295; *Williams* v. *Nixon,* 2 Beav. 472; White & Tudor's Leading Cases in Equity [4th Am. ed., Hare & Wallace's notes], 1794.) Although a trustee under a will, or an executor, who does not receive the money, or assume any control over it, is not responsible, yet if he knows, or has reason to know, that his co-trustee is using it improperly, or that it has "got into a course of abuse," he is liable if he fails to interpose. (*Brice* v. *Stokes,* 11 Vesey, 319; 327; *Adair* v. *Brimmer,* 74 N. Y. 539, 541, 566; *Clark* v. *Clark,* 8 Paige, 153; *Mucklow* v. *Fuller,* Jacob, 198, 199, 201; *Lincoln* v. *Wright,* 4 Beav. 427, 430; *Williams* v. *Nixon,* 2 id. 472; 2 Story's Eq. Jur., § 1280*a; Booth* v. *Booth,* 1 Beav..125, 129; *Thompson* v. *Finch,* 22 id. 316, 326, 327; *Stiles* v. *Guy,* 1 Hall & T. 330.) It is not enough to exonerate Mr. Smith for him simply to show that he was not present at the meeting of the directors and that he only knew it after the purchase was made. (*Land Credit Co.* v. *Lord Fermoy,* L. R., 8 Eq. 12; L. R., 5 Ch. Appeals, 753, 765, 769, 771; *Power* v. *O'Connor,* 19 Weekly Rep. 923, 926; *Lockwood* v. *Reilly,* 1 De Gex & Jones, 464, 476; *Sherman* v. *Parish,* 53 N. Y. 489.) The discharges in bankruptcy of

Gearty and Hoffman were not bars to this action. (§§ 5067, 5071, 5115, 5119, U. S. R. S. [2d ed. 1878]; *Zinn* v. *Ritterman*, 2 Abb. [N. S.] 261, 263; *Kellogg* v. *Schuyler*, 2 Denio, 73; *Crouch* v. *Gridley*, 6 Hill, 250; *Hodges* v. *Chase*, 2 Wend. 248; *Strong* v. *White*, 9 Johns. 288; 14 id. 128; *Re Rosey*, 8 B. 509, and *Re Vetterlein*, 13 Blatchf. 44; *Re Baxter*, 18 N. B. R. ; *Liquidators, etc.,* v. *Douglas*, 22; Session Cases [2d series], 476, 477; *Hart* v. *Story*, 1 Johns. 143; *Steinbach* v. *Hallett*, id. 141; *Wheaton* v. *McGlade*, 1 Wend. 34; *Arnoux* v. *Steinbrenner*, 1 Paige, 82; *Reeder* v. *Seelye*, 4 Cow. 548; *Phœnix* v. *Hill*, 3 Johns. 249; *St. John* v. *Dennison*, 9 How. 345.)

EARL, J. This action was brought by the receiver of the Central Savings Bank of the city of New York, against the defendants, who were trustees of the bank, to recover damages which, it is alleged, they caused the bank by their misconduct as such trustees.

The first question to be considered is the measure of fidelity, care and diligence which such trustees owe to such a bank and its depositors. The relation existing between the corporation and its trustees is mainly that of principal and agent, and the relation between the trustees and the depositors is similar to that of trustee and *cestui que trust*. The trustees are bound to observe the limits placed upon their powers in the charter, and if they transcend such limits and cause damage, they incur liability. If they act fraudulently or do a willful wrong, it is not doubted that they may be held for all the damage they cause to the bank or its depositors. But if they act in good faith within the limits of powers conferred, using proper prudence and diligence, they are not responsible for mere mistakes or errors of judgment. That the trustees of such corporations are bound to use some diligence in the discharge of their duties cannot be disputed. All the authorities hold so. What degree of care and diligence are they bound to exercise? Not the highest degree, not such as a very vigilant or extremely careful person would exercise. If such were required, it

would be difficult to find trustees who would incur the responsibility of such trust positions. It would not be proper to answer the question by saying the lowest degree. Few persons would be willing to deposit money in savings banks, or to take stock in corporations, with the understanding that the trustees or directors were bound only to exercise slight care, such as inattentive persons would give to their own business, in the management of the large and important interests committed to their hands. When one deposits money in a savings bank, or takes stock in a corporation, thus divesting himself of the immediate control of his property, he expects, and has the right to expect, that the trustees or directors, who are chosen to take his place in the management and control of his property, will exercise ordinary care and prudence in the trusts committed to them — the same degree of care and prudence that men prompted by self-interest generally exercise in their own affairs. When one voluntarily takes the position of trustee or director of a corporation, good faith, exact justice, and public policy unite in requiring of him such a degree of care and prudence, and it is a gross breach of duty — *crassa negligentia* — not to bestow them.

It is impossible to give the measure of culpable negligence for all cases, as the degree of care required depends upon the subjects to which it is to be applied. (*First Nat. Bank* v. *Ocean Nat. Bank,* 60 N. Y. 278.) What would be slight neglect in the care of a quantity of iron might be gross neglect in the care of a jewel. What would be slight neglect in the care exercised in the affairs of a turnpike corporation, or even of a manufacturing corporation, might be gross neglect in the care exercised in the management of a savings bank intrusted with the savings of a multitude of poor people, depending for its life upon credit and liable to be wrecked by the breath of suspicion. There is a classification of negligence to be found in the books, not always of practical value and yet sometimes serviceable, into slight negligence, gross negligence, and that degree of negligence intermediate the two, attributed to the absence of ordinary care; and the claim on

behalf of these trustees is that they can only be held responsible in this action in consequence of gross negligence, according to this classification. If gross negligence be taken according to its ordinary meaning — as something nearly approaching fraud or bad faith — I cannot yield to this claim; and if there are any authorities upholding the claim, I emphatically dissent from them.

It seems to me that it would be a monstrous proposition to hold that trustees, intrusted with the management of the property, interests and business of other people, who divest themselves of the management and confide in them, are bound to give only slight care to the duties of their trust, and are liable only in case of gross inattention and negligence; and I have found no authority fully upholding such a proposition. It is true that authorities are found which hold that trustees are liable only for *crassa negligentia*, which literally means gross negligence; but that phrase has been defined to mean the absence of ordinary care and diligence adequate to the particular case. In *Scott* v. *De Peyster* (1 Edw. Ch. 513, 543) — a case much cited — the learned Vice Chancellor said : " I think the question in all such cases should and must necessarily be, whether they (directors) have omitted that care which men of common prudence take of their own concerns. To require more, would be adopting too rigid a rule and rendering them liable for slight neglect ; while to require less, would be relaxing too much the obligation which binds them to vigilance and attention in regard to the interests of those confided to their care, and expose them to liability for gross neglect only — which is very little short of fraud itself." In *Spering's Appeal* (71 Penn. St. 11) Judge SHARSWOOD said : " They (directors) can only be regarded as mandataries — persons who have gratuitously undertaken to perform certain duties, and who are, therefore, bound to apply ordinary skill and diligence, but no more." In *Hodges* v. *New England Screw Co.* (1 R. I. 312) JENCKES, J., said : " The sole question is whether the directors have or have not bestowed proper diligence. They are liable only for ordinary care ; such care as prudent men take in their

own affairs." And in the same case, AMES, J., said: "They should not, therefore, be liable for innocent mistakes, unintentional negligence, honest errors of judgment, but only for willful fraud or neglect, and want of ordinary knowledge and care." The same case came again under consideration in 3 R. I. 9, and GREEN, Ch. J., said: "We think a board of directors, acting in good faith and with reasonable care and diligence, who nevertheless fall into a mistake, either as to law or fact, are not liable for the consequences of such mistake." In the case of *The Liquidators of the Western Bank* v. *Douglas* (11 Session Cases [3d series], 112 [Scotch]), it is said: "Whatever the duties (of directors) are, they must be discharged with fidelity and conscience, and with ordinary and reasonable care. It is not necessary that I should attempt to define where excusable remissness ends and gross negligence begins. That must depend to a large extent on the circumstances. It is enough to say that gross negligence in the performance of such a duty, the want of reasonable and ordinary fidelity and care, will impose liability for loss thereby occasioned." In *The Charitable Corporation* v. *Sutton* (2 Atkyns, 405) Lord Chancellor HARDWICKE said, that a person who accepted the office of director of a corporation "is obliged to execute it with fidelity and reasonable diligence," although he acts without compensation. In *Litchfield* v. *White* (3 Sandf. 545) SANDFORD, J., said: "In general, a trustee is bound to manage and employ the trust property for the benefit of the *cestui que trust* with the care and diligence of a provident owner. Consequently he is liable for every loss sustained by reason of his negligence, want of caution, or mistake, as well as positive misconduct."

In *Spering's Appeal*, Judge SHARSWOOD said that directors "are not liable for mistakes of judgment, even though they may be so gross as to appear to us absurd and ridiculous, provided they were honest, and provided they are fairly within the scope of the powers and discretion confided to the managing body." As I understand this language, I cannot assent to it as properly defining to any extent the nature of a director's responsibility. Like a mandatary, to whom he has been

SICKELS — VOL. XXXVII.     10

likened, he is bound not only to exercise proper care and diligence, but ordinary skill and judgment. As he is bound to exercise ordinary skill and judgment, he cannot set up that he did not possess them. When damage is caused by his want of judgment, he cannot excuse himself by alleging his gross ignorance. One who voluntarily takes the position of director, and invites confidence in that relation, undertakes, like a mandatary, with those whom he represents or for whom he acts, that he possesses at least ordinary knowledge and skill, and that he will bring them to bear in the discharge of his duties. (Story on Bailments, § 182.) Such is the rule applicable to public officers, to professional men and to mechanics, and such is the rule which must be applicable to every person who undertakes to act for another in a situation or employment requiring skill and knowledge; and it matters not that the service is to be rendered gratuitously. These defendants voluntarily took the position of trustees of the bank. They invited depositors to confide to them their savings, and to intrust the safe-keeping and management of them to their skill and prudence. They undertook not only that they would discharge their duties with proper care, but that they would exercise the ordinary skill and judgment requisite for the discharge of their delicate trust.

Enough has now been said to show what measure of diligence, skill and prudence the law exacts from managers and directors of corporations; and we are now prepared to examine the facts of this case, for the purpose of seeing if these trustees fell short of this measure in the matters alleged in the complaint.

This bank was incorporated by the act chapter 467 of the Laws of 1867, and it commenced business in the spring of that year, in a hired building, on the east side of Third avenue, in the city of New York. It remained there for several years, and then removed to the west side of the avenue, between Forty-fifth and Forty-sixth streets, where it occupied hired rooms until near the time of its failure in the fall of 1875. During the whole time the deposits averaged only about $70,-

000. In 1867, the income of the bank was $942.12, and the expenses, including amounts paid for safe, fixtures, charter, current expenses and interest to depositors, were $5,571.34. In 1868, the income was $5,471.43, and the expenses, including interest to depositors, $5,719.43. In 1869, the income was $3,918.27, and the expenses and interest paid $5,346.05. In 1870 the income was $5,784.09, and expenses and interest $7,040.22. In 1871 the income was $13,551.14, which included a bonus of $4,000, or $6,000 obtained upon the purchase of a mortgage of $40,000, which mortgage was again sold in 1874 at a discount of $2,000, and the expenses, including interest paid, were $9,124.05. In 1872 the income was $5,100.51, and the expenses, including interest paid, were $7,212.49. Down to the 1st day of January, 1873, therefore, the total expenses, including interest paid, were $5,046 more than the income. To this sum should be added $2,000, deducted on the sale of the large mortgage in 1874, which was purchased at the large discount in 1871, as above mentioned, and yet entered in the assets at its face. From this apparent deficiency should be deducted the value of the safe and furniture of the bank, from which the receiver subsequently realized $500. At the same date, the amount due to over one thousand depositors was about $70,000, and the assets of the bank consisted of about $13,000 in cash and the balance mostly of mortgages upon real estate.

While the bank was in this condition, with a lease of the rooms then occupied by it expiring May 1, 1874, the project of purchasing a lot and erecting a banking-house thereon began to be talked of among the trustees. The only reason put on record in the minutes of the meetings held by the trustees for procuring a new banking-house was to better the financial condition of the bank. In February, 1873, at a meeting of the trustees, a committee was appointed " on site for new building ; " and in March the committee entered into contract for the purchase of a plot of land, consisting of four lots, on the corner of Forty-eighth street and Third avenue, for the sum of $74,500; of which $1,000 was to be paid down, $9,000 on the first day

of May then next, and $64,000 to be secured by a mortgage, payable on or before May 1, 1875, with interest from May 1, 1873, at seven per cent; and there was an agreement that payment of the principal sum secured by the mortgage might be extended to May 1, 1877, provided a building should, without unavoidable delay, be erected upon the corner lot, worth not less than $25,000. This contract was reported by the committee to the trustees, at a meeting held April 7th. On the 1st day of May, 1873, the real estate was conveyed and the cash payment was made, and four separate mortgages were executed to secure the balance, one upon each lot. The mortgage upon the lot upon which the bank building was afterward erected was for $30,500. At the same time the bank became obligated to build upon that lot a building covering its whole front, 25 feet, and 60 feet deep, and not less than five stories high, and have the same inclosed by the first day of November then next. Upon that lot the bank proceeded, in the spring of 1875, to erect a building covering the whole front, and 76 feet deep, and five stories high, at an expense of about $27,000. And the building was nearly completed when the receiver of the bank was appointed, in November of that year. The three lots not needed for the building were disposed of, as we may assume, without any loss, leaving the corner lot used for the building to cost the bank $29,250; and we may assume that that was then the fair value of the lot. This case may then be treated as if these trustees had purchased the corner lot at $29,250, and bound themselves to erect thereon a building costing $27,000. When the receiver was appointed, that lot and building, and other assets which produced less than $1,000, constituted the whole property of the bank; and subsequently the lot and building were swept away by a mortgage foreclosure, and this action was brought to recover the damages caused to the bank by the alleged improper investment of its funds, as above stated, in the lot upon which the building was erected.

At the time of the purchase of the lot, the bank was substantially insolvent. If it had gone into liquidation, its assets would have fallen several thousand dollars short of discharging

its liabilities, and this state of things was known to the trustees. It had been in existence about six years, doing a losing business. The amount of its deposits, which its managers had not been able to increase, shows that the enterprise was an abortion from the beginning, either because it lacked public confidence, or was not needed in the place where it was located. It had changed its location once without any benefit. It had on hand but about $13,000 in cash, of which $10,000 were taken to make the first payments. The balance of its assets was mostly in mortgages not readily convertible. One was a mortgage for $40,000, which had been purchased at a large discount, and we may infer that it was not very saleable, as the trustees resolved to sell it as early as May, 1873, and in August, 1873, authorized it to be sold at a discount of not more than $2,500, and yet it was not sold until 1874. In this condition of things the trustees made the purchase complained of, under an obligation to place on the lot an expensive banking-house. Whether, under the circumstances, the purchase was such as the trustees, in the exercise of ordinary prudence, skill and care, could make; or whether the act of purchase was reckless, rash, extravagant, showing a want of ordinary prudence, skill and care, were questions for the jury. It is not disputed that, under the charter of this bank, as amended in 1868 (chap. 294), it had the power to purchase a lot for a banking-house "requisite for the transaction of its business." That was a power, like every other possessed by the bank, to be exercised with prudence and care. Situated as this moribund institution was, was it a prudent and reasonable thing to do, to invest nearly half of all the trust funds in this expensive lot, with an obligation to take most of the balance to erect thereon an extravagant building? The trustees were urged on by no real necessity. They had hired rooms where they could have remained; or if those rooms were not adequate for their small business, we may assume that others could have been hired. They put forward the claim upon the trial that the rooms they then occupied were not safe. That may have been a good reason for making them more secure, or for getting other rooms, but not

for the extravagance in which they indulged. It is inferable, however, that the principal motive which influenced the trustees to make the change of location was to improve the financial condition of the bank by increasing its deposits. Their project was to buy this corner lot and erect thereon an imposing edifice, to inspire confidence, attract attention, and thus draw deposits. It was intended as a sort of advertisement of the bank, a very expensive one indeed. Savings banks are not organized as business enterprises. They have no stockholders, and are not to engage in speculations or money-making in a business sense. They are simply to take the deposits, usually small, which are offered, aggregate them, and keep and invest them safely, paying such interest to the depositors as is thus made, after deducting expenses, and paying the principal upon demand. It is not legitimate for the trustees of such a bank to seek deposits at the expense of present depositors. It is their business to take deposits when offered. It was not proper for these trustees — or at least the jury may have found that it was not — to take the money then on deposit and invest it in a banking-house, merely for the purpose of drawing other deposits. In making this investment, the interests of the depositors, whose money was taken, can scarcely be said to have been consulted.

It matters not that the trustees purchased this lot for no more than a fair value, and that the loss was occasioned by the subsequent general decline in the value of real estate. They had no right to expose their bank to the hazard of such a decline. If the purchase was an improper one when made, it matters not that the loss came from the unavoidable fall in the value of the real estate purchased. The jury may have found that it was grossly careless for the trustees to lock up the funds in their charge in such an investment, where they could not be reached in any emergency which was likely to arise in the affairs of the crippled bank.

We conclude, therefore, that the evidence justified a finding by the jury that this was not a case of mere error or mistake of judgment on the part of the trustees, but that it was a case

of improvidence, of reckless, unreasonable extravagance, in which the trustees failed in that measure of reasonable prudence, care and skill which the law requires.

This case was moved for trial at a Circuit Court, and before the jury was impaneled, the defendants claimed that the case was improperly in the circuit, and that it should be tried at Special Term; and the court ordered that the trial proceed, and at the close of the evidence, the defendants moved that the complaint be dismissed, on the ground that the action was not a proper one to be tried before a jury, and should be tried before the equity branch of the court. The motion was denied, and these rulings are now alleged for error. The receiver in this case represents the bank, and may maintain any action the bank could have maintained. The trustees may be treated as agents of the bank. (*In re German Mining Co.*, 27 Eng. Law & Eq. 158; *Belknap* v. *Davis*, 19 Me. 455; *Bedford R. R. Co.* v. *Bowser*, 48 Penn. St. 29; *Butts* v. *Wood*, 38 Barb. 181; *Austen* v. *Daniels*, 4 Den. 299; *O. & M. R. R. Co.* v. *McPherson*, 35 Mo. 13); and for any *misfeasance*, or *non-feasance*, causing damage to the bank, they were responsible to it, upon the same principle that any agent is for like cause responsible to his principal. It has never been doubted that a principal may sue his agent in an action at law for any damages caused by culpable *misfeasance* or *non-feasance* in the business of the agency. The only relief claimed in this complaint was a money judgment, and we think it was properly tried as an action at law. No equitable rights were to be adjusted, and there was no occasion to appeal to an equitable forum.

Treating this, therefore, as an action at law, it follows also that the objection taken that other trustees should have been joined as defendants cannot prevail. In actions *ex delicto*, the plaintiff may sue one, some or all of the wrong-doers. (*Liquidators of the Western Bank* v. *Douglas*, 22 Session Cases [2d series] 475 [Scotch]; Barbour on Parties, 203.)

The defendants Hoffman and Gearty filed petitions for their discharge in bankruptcy after the commencement of this action,

and were discharged before judgment, and they alleged such discharge as a defense to the action. The trial judge and the General Term held that the discharge furnished no defense, and we are of the same opinion. This claim was purely for unliquidated damages occasioned by a tort. Such a claim was not provable in bankruptcy, and, therefore, was not discharged. (U. S. Rev. Stat. [2d ed.], §§ 5115, 5119, 5067 to 5071; *Zinn* v. *Ritterman*, 2 Abb. [N. S.] 261; *Kellogg* v. *Schuyler*, 2 Den.. 73; *Crouch* v. *Gridley*, 6 Hill, 250; *In re Wiggers*, 2 Biss. 71; *In re Clough*, 2 Ben. 508; *In re Sidle*, 2 Bank. Reg. 77.) I conclude, therefore, that the judgment appealed from should be affirmed.

The appeal by the plaintiff from the order of the General Term, granting a new trial as to defendant Smith, must, for reasons stated on the argument, be dismissed, with costs.

All concur.

Judgment affirmed and appeal from order dismissed.