# Richmond

MARY J. O'CONNOR, ET ALS. V. FIRST NATIONAL INVESTORS'
CORPORATION OF VIRGINIA, ET ALS.

January 17, 1935.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Browning and
Chinn, JJ.

The opinion states the case.

*Hart & Hart* and *Showalter, Parsons, Kuyk & Coleman,* for the appellants.

*W. B. Kegley, Willis & Hunter,* and *Woods, Chitwood, Coxe & Rogers,* for the appellees.

CHINN, J., delivered the opinion of the court.

This is a suit in equity brought by Mary J. O'Connor, Daisy S. Tompkins, E. Kate Tompkins and Mattie C. Borden, suing in behalf of themselves and other stockholders of First National Investors' Corporation of Virginia, against R. W. Shoaf, C. J. Shoaf, D. C. Brown, G. V. Yonce, R. E. Paine, W. J. McCorkindale, R. J. Meybin, M. L. Harrison and H. C. Neren, directors of said corporation, seeking to recover losses alleged to have been occasioned by the negligence of said directors in the administration of its affairs. The court below entered judgment against R. W. Shoaf and C. J. Shoaf, but held the other directors above named

not liable. From that decree the complainants have appealed.

The material facts leading up to this litigation may be stated as follows: Shoaf and Shoaf, Incorporated, was a stock brokerage company with its principal office located in the city of Roanoke. This company was controlled and operated by two brothers, R. W. Shoaf and C. J. Shoaf, who were president and vice-president, respectively. It was not a member of any organized stock exchange, and dealt in listed securities through Pynchon and Company, members of the New York Stock Exchange. In the year 1928, R. W. Shoaf, who throughout all the subsequent transactions connected with this litigation was the active and dominating figure, conceived the idea of organizing and promoting a stock company commonly known as an investment trust for the general purpose of investment of its funds in stocks and bonds, reselling the same when expedient, and re-investment of the proceeds in other securities. Accordingly, a charter was obtained for the First National Investors' Corporation of Virginia (hereinafter referred to as Investors' Corporation) with an authorized capital of $800,000 class A seven per centum preferred stock, divided into shares having a par value of $25 per share, and 2,000 shares of class B stock of no par value, but with equal voting power per share.

The organization meeting was held on September 20, 1928, at which time, it appears from the minutes, R. W. Shoaf and C. J. Shoaf had each subscribed to 200 shares of class A stock, the minimum amount required under the charter to effect an organization, and a board of directors was thereupon elected, composed of R. W. Shoaf, C. J. Shoaf, W. P. Hazelgrove and R. E. Paine. By resolution of the board of directors adopted at its initial meeting held on the same day, the entire authorized issue of 2,000 shares of class B stock was voted to be issued to R. W. Shoaf as compensation for his services in promoting the corporation.

Nothing more of any importance was done until the first annual meeting of the stockholders held on February 12,

1929. At this meeting R. W. Shoaf, C. J. Shoaf, D. C. Brown, G. V. Yonce and R. E. Paine were elected directors for the corporation. D. C. Brown and G. V. Yonce were employees of Shoaf and Shoaf, Incorporated, being bookkeeper and salesman, respectively, for that concern. Up to that time no additional stock had been subscribed for.

At a meeting of these directors held on February 23, 1929, R. W. Shoaf was re-elected president, C. J. Shoaf, vice-president, and D. C. Brown elected secretary-treasurer of the corporation. A resolution was also passed approving a contract between the Investors' Corporation and Shoaf and Shoaf, Incorporated, whereby Shoaf and Shoaf, Incorporated, was given exclusive control of the sale of all class A stock of said corporation at the price of $26.75 per share, of which $1.75 per share was to be retained by Shoaf and Shoaf as commissions.

At the next meeting of the board of directors, held on May 23, 1929, a resolution was adopted giving Shoaf and Shoaf an option to purchase at $25 per share all the class A stock which should be issued by the corporation for a period of five years, and providing that said stock should be sold only through Shoaf and Shoaf, Incorporated, in case they failed to exercise their option to purchase the same.

A special meeting of the stockholders was called and held on June 1, 1929, at which time it appears a permanent organization was effected, and the corporation really started in business. At this meeting W. J. McCorkindale, R. J. Meybin, M. L. Harrison and D. D. Hatfield, who had become stockholders, were added to the board of directors. A meeting of the board was held on the same day when D. C. Brown resigned from the board and H. C. Neren, who had also purchased stock, was elected in his place. An executive committee was elected, composed of R. W. Shoaf, R. E. Paine and G. V. Yonce. R. E. Paine was a youth in the employ of Shoaf and Shoaf. As stated, Yonce was also an employee of the same concern. The executive committee, therefore, really consisted of R. W. Shoaf himself. It may be here stated that it appears from the record that D. D.

Hatfield afterwards declined to act as director and never attended any of the meetings of the board.

Between the date of the aforesaid meeting, June 1, 1929, and July 18, 1931, only five meetings of the board of directors were held, same being on the following dates: July 15, 1929, November 15, 1929, January 15, 1930, July 15, 1930, and January 27, 1931.

At the meeting of the board held on July 15, 1929, a resolution was adopted authorizing the president, R. W. Shoaf, to select a depository for the securities and valuable papers belonging to the corporation, and providing that all withdrawals of such securities and papers from the custodian should be made only upon the written request of D. C. Brown or C. J. Shoaf, with the written consent of W. J. McCorkindale or R. E. Paine. It was further resolved, "that any funds of the corporation not invested in securities may be left and placed to the credit of the corporation with Shoaf and Shoaf, Incorporated, such amount not to exceed $25,000, until the further order of this board." At this meeting all the directors were present except W. J. McCorkindale and M. L. Harrison. It appears that the Colonial-American National Bank of Roanoke was selected as the custodian and a contract with that institution was entered into accordingly.

At the meeting of the board of directors held on November 15, 1929, at which R. W. Shoaf, C. J. Shoaf, W. J. McCorkindale, G. V. Yonce and R. E. Paine were present, the following resolution was adopted: "Resolved, that R. W. Shoaf, president of this corporation be, and he is hereby specifically authorized and empowered to sell, assign, transfer and deliver any securities now owned by this corporation, and to execute all necessary or proper assignments, indorsements, or other instruments of transfer which may be necessary or requisite to effect any sale or transfer so made by him."

The meeting of January 15, 1930, was called for the purpose of declaring a dividend on the class A stock, and a list of the securities held by the Investors' Corporation, as of

December 31, 1929, was presented by the president and approved by the board. At this meeting there were present R. W. Shoaf, C. J. Shoaf, W. J. McCorkindale, R. E. Paine and G. V. Yonce.

At the next annual meeting of the stockholders, held on February 11, 1930, the same directors were elected and D. C. Brown was again placed on the board.

The meeting of the board held on July 15, 1930, was called for the purpose of declaring a dividend. At this meeting there were present D. C. Brown, R. W. Shoaf, C. J. Shoaf, W. J. McCorkindale, R. E. Paine and G. V. Yonce. A list of securities owned by the corporation was presented to the board and thereby approved.

The meeting of the board of directors of January 28, 1931, was also for the purpose of declaring a dividend. At this meeting R. W. Shoaf, C. J. Shoaf, W. J. McCorkindale, R. E. Paine, G. V. Yonce and D. C. Brown were present. The third annual meeting of the stockholders was held on February 10, 1931, when the same board of directors was elected, with the addition of Bolling H. Handy, who refused to accept and never served.

In April, 1931, news was received in Roanoke that Pynchon and Company, New York correspondent of Shoaf and Shoaf, Incorporated, had become insolvent, and the last named concern thereupon suspended operations. Mr. McCorkindale inquired of R. W. Shoaf whether the Investors' Corporation had been affected by the Pynchon failure, and being assured that it had not, no further action was taken by any of the directors or the board until July 18, 1931, when a meeting of the board was called to consider the affairs of the corporation for the reason that there were persistent rumors on the streets of Roanoke to the effect that Shoaf and Shoaf, Incorporated, were in financial difficulties and were about to be placed in the hands of receivers. At this meeting, for the first time since June 1, 1929, all of the directors were present and a committee was appointed to investigate the affairs of the corporation and report their findings to the board.

Another meeting of the board was held on July 22, 1931. At this meeting the only director absent was M. L. Harrison. The committee previously appointed reported that, although it had not been allowed sufficient time to make a thorough investigation, it was satisfied that there had been a wholesale misappropriation of the securities of the corporation, that the affairs of the corporation had been "grossly mismanaged," and the interests of the corporation had been jeopardized by the "close association between the president of this corporation and Shoaf and Shoaf, Incorporated." The committee then recommended that the present officers and executive committee of the corporation resign, and new officers and a new executive committee be elected in their place. At this meeting R. W. Shoaf, C. J. Shoaf and D. C. Brown, president, vice-president and secretary-treasurer, respectively, resigned, and G. V. Yonce was elected president, W. J. McCorkindale, vice-president, and D. C. Brown re-elected secretary-treasurer of the corporation. It appears from the record that up to the time of the suspension of Shoaf and Shoaf, Incorporated, 4,000 shares of class A stock had been disposed of at $25 per share, thereby making the paid-in capital of the corporation amount to $100,000.

As already noted, after June 1, 1929, only five directors' meetings were held. The minute book shows that W. J. McCorkindale, who was elected on June 1, 1929, was present at all of the above five meetings, except that of July 15, 1929. Harrison, who was elected on the same date, attended no meetings after June 1, 1929, until after the suspension of Shoaf and Shoaf, Incorporated, in the spring of 1931. Meybin, who was elected on the same date, was present at the meeting of July 15, 1929, but was absent from all subsequent meetings until after said suspension. Neren, who was also elected June 1, 1929, attended the meeting of July 15, 1929, but was absent from all subsequent meetings until that of July 18, 1931, held after the said suspension took place. R. E. Paine, who was elected September 20, 1928, appears to have attended every meeting of

the board until after the suspension, except that of June 1, 1929. Of the defendant directors the following were stockholders in Shoaf and Shoaf, Incorporated: Neren, McCorkindale, Yonce, Brown, R. W. Shoaf and C. J. Shoaf. The record further shows that Mr. McCorkindale owned $3,000 in the stock of Shoaf and Shoaf, Incorporated, and $2,500 in the stock of the Investors' Corporation. Mr. Neren had $2,000 in Shoaf and Shoaf, Incorporated, and $1,250 in stock in the Investors' Corporation. Mr. Harrison had four shares of class A stock in the Investors' Corporation. R. E. Paine had five shares of class B stock, for which he paid $25. Mr. Yonce had one share of class B stock. Mr. Brown owned twenty shares of class B stock. Mr. Meybin owned 100 shares, or $2,500, in class A stock. According to the books, R. W. Shoaf owned 217 shares of class A stock prior to April, 1931, after which he only owned three shares of class A stock. He also owned the whole issue of class B stock, except the few shares he had sold as above stated. C. J. Shoaf, apparently really owned no stock.

It appears from the record that the prospectuses and literature circulated by Shoaf and Shoaf, Incorporated, and their salesmen among prospective and possible buyers of the stock of the Investors' Corporation, contained a list of the officers and directors of the corporation, with their several occupations. Mr. Neren is general manager of the Viscose Corporation of Virginia; Mr. Meybin, vice-president and general manager of the Virginia Bridge and Iron Company; Mr. Harrison, president of the M. L. Harrison Tie and Lumber Company, and vice-president of the Farmers Bank, of Southwest Virginia; Mr. McCorkindale, general manager of the Roanoke Gas and Light Company, and director of the Mountain Trust Bank, of Roanoke; Mr. Paine, secretary-treasurer of the Mountain Trust Bank. It thus appears that the above mentioned directors were men of large affairs and responsibility and extensive business experience, and were duly advertised as such in the stock-selling literature distributed by Shoaf and Shoaf, Incor-

porated. These prospectuses distributed also held out other inducements, such as the following:

"Investments will be made only upon a majority vote of the board of directors, or the executive committee. The personnel of the executive committee and directors has been determined by the known experience of each in the function to which he is accredited in the corporation." Another stock-selling advertisement filed as an exhibit with the evidence says: "The keystone to the success of such an investment trust, therefore, is the ability and integrity of the management in control. * * * Realizing the importance of having the direction and management in the hands of thoroughly competent and experienced directors, the board of directors of the First National Investors' Corporation of Virginia has been chosen with particular care with the view to putting the management of the corporation in the hands of a group of men especially qualified to successfully administer the affairs of the company."

In their answer to the bill filed by McCorkindale, Meybin, Harrison, Yonce and Neren, the defendants say: "The duties of the directors of the First National, other than those who are also officers of Shoaf and Shoaf, Incorporated, were such as to require the major portion of the time and attention of such directors in their own respective businesses, and to preclude the possibility of such directors giving attention to detailed matters in connection with the affairs of the First National." It is admitted, however, by Messrs. Meybin, Neren, Harrison and McCorkindale in their testimony that they agreed to become directors solely because they were requested to do so by R. W. Shoaf, who doubtless desired their names on the directorate for the purpose of influencing people to purchase the stock of the corporation.

After the committee appointed by the board of directors made their report at the meeting held on July 22, 1931, Crawford, Stull and Company, certified public accountants, were engaged to make an audit of the books, records and accounts of the Investors' Corporation. The report of this

audit, which is filed in the evidence, shows among other things that Shoaf and Shoaf, Incorporated, unloaded on the Investors' Corporation a number of securities at a price above the market value, and securities belonging to the corporation of the value of $6,643 were withdrawn from the custodian bank by Shoaf and Shoaf, Incorporated, and forwarded to Pynchon and Company for the apparent purpose of providing additional collateral for Shoaf and Shoaf's margin account; that these securities were in the possession of Pynchon and Company at the time of their failure, and would doubtless be loss to the corporation. The audit further states that on June 1, 1931, 2,500 shares of stock of Wachovia Springs Water Company, of no market value, were turned over to Investors' Corporation at a par value of $10 per share; that this was to replace $25,000, the proceeds of the sale of gilt edge securities which had been appropriated by Shoaf and Shoaf, Incorporated; and that Shoaf and Shoaf, Incorporated, gave the Investors' Corporation its note for $20,000 with worthless collateral in lieu of $20,000 proceeds of the sale of stocks. The audit further states that Shoaf and Shoaf also owe $4,520.03, included in which are unauthorized cash advances to Shoaf and Shoaf, Incorporated, and R. W. Shoaf individually. The said report concludes as follows:

"A detailed examination of the transactions of the company reveals the fact that its affairs have been grossly mismanaged; that its securities have been sold by its fiscal agents without regard to values, and for the express purpose of providing funds to enable them to continue other operations; that the treasury of the company has been depleted time after time through the unauthorized purchase of questionable and unmarketable securities from your fiscal agents; and that your fiscal agents have been the recipients of approximately fifty thousand dollars of the company's cash in lieu of their unwarranted and unauthorized substitution of a demand note and securities without value."

In the answer referred to this is also said:

"The audit subsequently made disclosures that:

"(1) President R. W. Shoaf had not deposited all of the securities of the corporation with the depository bank, as he had reported to the directors at their meeting on November 15, 1929;

"(2) On requisitions signed by Vice-President C. J. Shoaf and countersigned by Director R. E. Paine, President R. W. Shoaf had withdrawn most of the securities actually deposited and had substituted in their place very few new securities to represent the proceeds arising from the sale of withdrawn securities. Most of the new securities that were deposited in the place of those withdrawn were themselves subsequently withdrawn;

"(3) The securities thus withheld and withdrawn from deposit by President R. W. Shoaf were endorsed by him in the name of the corporation, placed with Shoaf and Shoaf, Incorporated, and all misappropriated by the latter, except such as were repossessed by some of respondents on July 13, 1931, as above mentioned;

"(4) Although the secretary-treasurer of the corporation had previously reported to the directors, as well as the stockholders, that the corporation had on hand on December 31, 1930, securities of a book value aggregating $88,347.-15, the book value of the securities actually on hand on July 18, 1931, was only $20,037.55, a discrepancy of $68,955.16. Similarly, the balance sheet of December 31, 1930, had shown cash in bank and on deposit with Shoaf and Shoaf, Incorporated, of $13,955.16, whereas the cash on hand on July 18, 1931, amounted to only $2,778.53, a discrepancy of $11,178.63; and,

"(5) * * * Without an audit of the books of Shoaf and Shoaf, Incorporated, it is not possible to tell the market value of these securities at the time they were actually misappropriated. The records of the depository bank show the dates of the withdrawals of all securities that were actually deposited and it may be assumed that they were converted as of that date, but the records of First National do not show the date of the conversion of the securities

that were never deposited, unless failure to deposit them be treated as a conversion as of that date."

In short, it appears clear from the report of the directors' committee, and from the audit and admissions in the answer, that in addition to the sums lost by the corporation through mismanagement on the part of Shoaf and Shoaf in the purchase and sale of its securities, certainly as much as $49,520.03 of the corporation's funds were actually misappropriated by its president, R. W. Shoaf, for his own use in the operations of his brokerage business. And it is for this amount complainants are seeking to hold the directors personally responsible.

The question to be determined is, therefore, whether in the foregoing state of facts the defendant directors are liable for the defalcations above mentioned. The question of the degree of care required of the directors of a corporation in discharge of their duties is well settled in Virginia, as elsewhere.

In the case of *Marshall* v. *F. & M. Savings Bank,* 85 Va. 676, 8 S. E. 586, 590, 2 L. R. A. 534, 17 Am. St. Rep. 84, the opinion quotes from Morawetz on Private Corporations, section 552, as follows: " 'Attempts have been made to define the degree of care and prudence which directors must exercise in the performance of their duties. In some of the cases it has been said that inasmuch as directors are usually not paid for their services, they are to be regarded as mandataries—persons who have gratuitously undertaken to perform certain duties, and are bound to exercise only ordinary care and prudence—and that they are liable to the corporation only for what is called *crassa negligentia,* or gross negligence. But all this is, at the best, misleading. The plain and obvious rule is that directors impliedly undertake to use as much diligence and care as the proper performance of the duties of their office requires. What constitutes a proper performance of the duties of a director is a question of fact, which must be determined in each case in view of all the circumstances, the character of the company, the condition of its business, the usual methods of

managing such companies, and all other relevant facts must be taken into consideration. It is evident that no abstract reasoning can be of service in reaching a proper solution.' " The above rule is quoted with approval in *Winston* v. *Gordon,* 115 Va. 899, 80 S. E. 756, and has been frequently quoted with approval in numerous decisions outside of this jurisdiction.

In *Anderson* v. *Bundy,* 161 Va. 1, 171 S. E. 501, 506, Mr. Justice Holt quotes from the leading case of *Hun* v. *Cary,* 82 N. Y. 65, 37 Am. Rep. 546, as follows: " 'Few persons would be willing to deposit money in savings banks, or to take stock in corporations, with the understanding that the trustees or directors were bound only to exercise slight care, such as inattentive persons would give to their own business, in the management of the large and important interest committed to their hands. When one deposits money in a savings bank, or takes stock in a corporation, thus divesting himself of the immediate control of his property, he expects, and has the right to expect, that the trustees or directors, who are chosen to take his place in the management and control of his property will exercise ordinary care and prudence in the trust committed to them—the same degree of care and prudence that men prompted by self-interest exercise in their own affairs.' " See also *Warren* v. *Robison,* 19 Utah 289, 57 P. 287, 75 Am. St. Rep. 734; *Lippitt* v. *Ashley,* 89 Conn. 451, 94 A. 995; *Solomon* v. *Bates,* 118 N. C. 311, 24 S. E. 478, 54 Am. St. Rep. 725.

As seen, the directors in the instant case exercised no supervision or control over the management of the Investors' Corporation whatever, but turned the entire capital and assets of the corporation over to the exclusive custody and management of the president, R. W. Shoaf, who was also the president and controlling spirit of Shoaf and Shoaf, Incorporated. In fact, the evidence shows that so far as management was concerned R. W. Shoaf constituted the Investors' Corporation, and Shoaf and Shoaf, Incorporated, was really R. W. Shoaf. These directors not only authorized R. W. Shoaf to retain in cash, in the name of

Shoaf and Shoaf, Incorporated, one-fourth of the entire capital of the corporation at his option, but gave him exclusive authority to buy and sell securities for the corporation at his own will and pleasure without keeping any check whatever on his operations. The only excuse offered by the directors for giving R. W. Shoaf this unlimited authority to use the stockholders' money is, that they had absolute confidence in said Shoaf, who held himself out to be an expert in regard to investments and corporate securities, and knowing nothing about it themselves, they did not consider it necessary for them to exercise any supervision or judgment in regard to the purchase and sale of the securities.

In 3 Fletcher on Corporations (Perm. Ed.) sec. 1071, it is said: "It is negligence for directors to leave the management entirely to others; and they may be held liable for breaches of trust committed by the officers to whom the management is intrusted. * * * While directors may commit the active transaction of the corporate business to duly authorized officers, they are not thereby absolved from the duty of reasonable supervision. 'Unfortunately some directors appear to think that they have fully discharged their duties by acting as figureheads and dummies,' says Justice Lumpkin, but he adds that 'this is a mistake and a delusion from which some of them are now and then awakened by a judgment for damages arising from allowing the corporation to be looted while they sat negligently by and looked wise.' "

And in 2 Thompson on Corporations (3d Ed.) p. 922, this is said: "The fact that directors of a corporation do, and must commit the details of its business to executive and inferior officers does not absolve them from the duty of maintaining a reasonable supervision, and if such officers waste the assets of the corporation the directors, ordinarily, cannot escape liability on the ground that they did not know of the wrong doing, where it is made to appear that their ignorance was the result of a want of that care which ordinarily prudent and diligent men would exercise under

similar circumstances." And, on page 931 the said author says: "Directors committing the management of the corporation to its president, are not excused from liability on the ground that they believed him to be honest, faithful and competent, and that they had reason for such belief and no reasonable ground to believe that he was misappropriating funds of the corporation to his own use."

Defendants contend that it would have been impracticable if not impossible, for them to have supervised the details of the purchase and sale of the securities for the corporation. Granted that this is true, the directors knew, or should have known, that those who bought stock in the corporation were relying upon the fact that they were directors and had supervision of the affairs of the corporation, and that all securities would be at least purchased under the supervision of the executive committee, as advertised. It appears, however, that the executive committee never functioned as such in any respect. In fact, as previously observed, the executive committee really consisted of R. W. Shoaf alone. It also appears that several of the most prominent and influential business men on the board of directors, to-wit, Mr. Meybin, Mr. Neren and Mr. Harrison, did not even attend the few meetings held by the board after they were elected, and paid no attention whatever to the affairs of the company. While Mr. McCorkindale did attend the directors' meetings, his testimony shows that he knew nothing whatever of what R. W. Shoaf was doing beyond what Shoaf chose to tell him, and that his attendance on the meetings was purely perfunctory. As an excuse for his lack of diligence he stated in his testimony: "Well, I felt that the Shoaf boys were the ones really handling the whole proposition, and it was safer in their hands than mine or somebody else that did not know how to run something of that kind. I had, unfortunately, implicit confidence in both the boys from the way they talked about their good names and their father in Rocky Mount, and the way they talked about it disarmed me from having any suspicion about them, or that they would do anything

wrong." The other directors who attended the meetings of the board were the two Shoafs, D. C. Brown, bookkeeper for Shoaf and Shoaf, G. V. Yonce, their salesman, and Mr. R. E. Paine. As already stated, Brown and Yonce were mere figureheads on the board, subject to the orders of R. W. Shoaf. It is difficult to believe that the two latter directors, on account of their connection with Shoaf and Shoaf, did not know, or at least have reason to suspect, what was going on. It is also difficult to understand why Mr. Paine, who it appears, along with C. J. Shoaf, signed all the orders on the custodian bank for the withdrawal of securities, should have quietly acquiesced in Shoaf's transactions in the withdrawals and sales of the securities, as he did, without undertaking to either keep a check on such withdrawals himself, or at least suggest to the board of directors that this be done.

But it is said that none of the directors had any reason to suspect that Shoaf was robbing the company, and no means of ascertaining that fact if they had suspected it. We do not think this defense is sound. It appears that the officers and managers of this brokerage concern, Shoaf and Shoaf, Incorporated, were promoters of corporate enterprises, that they dealt in securities of doubtful and purely speculative value, and that they are men of no property. Ordinary prudence would, we think, have dictated to the board of directors of this corporation under these circumstances to have an occasional audit of the affairs of the corporation, if they did not undertake to make such an examination themselves as was done when it was too late. It seems, moreover, that at each meeting of the board of directors a list of securities Shoaf claimed had been purchased and were owned by the corporation, was presented to and approved by the board without any examination or investigation of the list whatever. It turned out that some of the securities purchased by Shoaf with the stockholders' money were never deposited with the custodian bank at all; that many of those that had been deposited were withdrawn and the proceeds either used by Shoaf in his own

transactions, or invested in other securities which were retained by Shoaf and Shoaf and used by them in their manipulations. It is stated in the answer that as early as the fall of 1929 the president of the corporation, R. W. Shoaf, had failed to deposit with the custodian bank all the securities which had been up to that time purchased for the company. The directors knew when the stock market collapse occurred in October, 1929, that many banks and financial institutions went down in the crash, and many others were tottering; that a state of panic existed in the stock market. This circumstance was of itself sufficient to put the board of directors on guard, and the simple process of having an audit would have disclosed the fact that Shoaf had not deposited securities belonging to the corporation with the custodian, or, in lieu of an audit, the same fact would have been ascertained if the directors themselves had made an examination of the securities held by the custodian in comparison with the list of securities which Shoaf furnished them. If this had been done the directors would have had the knowledge and opportunity necessary to prevent the defalcations which were afterwards disclosed by the exercise of a little diligence on their part, or would at least have discovered such defalcations before they had gone far enough to bring the company to the state of ruin it now occupies. Instead of doing this, not a single one of the board of directors ever examined the securities owned by the corporation, or made any effort to ascertain whether R. W. Shoaf's list was true and correct. On the other hand, it appears from the minutes that at a meeting of the board of directors on November 15, 1929, immediately following the stock market crash, the board of directors passed a resolution enlarging the powers already vested in him by specifically authorizing R. W. Shoaf to sell and deliver any securities owned by the corporation, and to execute all assignments or other instruments of transfer necessary to effect any sale made by him.

As said by Chief Justice Campbell in *Williams* v. *Fidelity Loan, etc., Co.*, 142 Va. 43, 128 S. E. 615, 622, 45 A. L. R.

664: "The spirit of the times was a potent factor in every financial transaction." Considering the financial conditions then existing throughout the country, especially among all financial institutions, we think it would be difficult to conceive of a greater lack of care and prudence than was exhibited by the board of directors of this corporation in passing the resolution above referred to, which we may fairly assume was done at the solicitation of R. W. Shoaf himself in order to use the securities of the corporation for his own salvation, even though temporary. Aside from the failure of the directors to exercise reasonable supervision of Shoaf's actions as president of the company, the above action of the board, without even requiring of Shoaf the safeguard of a bond, was of itself, we think, inexcusable negligence under the circumstances.

In *Marshall* v. *F. & M. Savings Bank, supra,* the court said: "Directors are not merely bound to be honest, they must also be diligent and careful in performing the duties they have undertaken. They cannot excuse imprudence on the ground of their ignorance or inexperience, or the honesty of their intentions; and if they commit an error of judgment through mere recklessness, or want of ordinary prudence and skill, the corporation may hold them responsible for the consequences. See the case of *Hun* v. *Cary,* 82 N. Y. 65 [37 Am. Rep. 546]; Earl, J., saying in delivering the opinion in that case: 'One who voluntarily takes the position of director and invites confidence in that relation, undertakes like a mandatary, with those whom he represents, or for whom he acts, that he possesses at least ordinary knowledge and skill, and that he will bring them to bear in the discharge of his duties.' "

In *Anderson* v. *Bundy, supra,* Mr. Justice Holt, quoting from the notable opinion of Vice Chancellor Pitney (then of the New Jersey court), in the case of *Campbell* v. *Watson,* 62 N. J. Eq. 396, 50 A. 120: " 'If a man feels that he has not had sufficient business experience to qualify him to perform the duties of a director, he should either acquire the knowledge by inquiry, or refuse to act.' "

And further referring to the last named case, the opinion in *Anderson* v. *Bundy* quotes with approval 4 Fletcher on Corporations, section 2490, as follows: " 'It is submitted that the decision represents what may be said to be the growing tendency of the courts to hold directors liable for acts of executive officers, in a proper case, instead of using high sounding and flowery language in announcing the responsible duties and grave liabilities of directors and then exonerating them from liability because they did not actually participate in, or have actual knowledge of, the misdeeds of the executive officer.' "

In 2 Thompson on Corporations (3d Ed.) p. 922, the author says this: "The true theory in this class of cases disregards the subtle and impracticable distinction between ordinary negligence and inattention and gross negligence and inattention, and holds directors responsible for not knowing that of which they had the means of knowledge; and, while relieving them from the responsibility of insurers, ascribes liability on the ground of igorance of that which could have been discovered by that good business diligence which is incumbent upon them."

It will not do, therefore, for these gentlemen to say that they did not have time to attend the meetings of the board, or that they knew nothing about the business, and had absolute confidence in R. W. Shoaf, and had no reason to suspect that he was misusing the assets of the corporation, when the evidence shows that some of them failed to discharge any duties as directors by staying away from the meetings of the board, and that those who did attend seemed to have deliberately closed their eyes to what Shoaf was doing when they could have easily discovered the true state of affairs by exercising ordinary care in making an occasional investigation of the affairs of the corporation.

It is contended that the cases hereinbefore cited, which we think are controlling of the instant case, involved the liability of bank directors and the principles therein laid down do not apply to the case at bar. To this proposition we cannot agree. As previously said, the degree of care re-

quired of the directors of a corporation must depend upon the character of the corporation and the circumstances of each particular case. When we compare the business of this corporation with that of a bank it seems to us that at least as much care should be required of the directors in the instant case as on the part of the directors of a bank, for the reason that a bank is subject to the supervision and examination of the federal or State banking authorities, as the case may be, and the law requires the directors themselves to make periodical examinations of such institutions, and spread the result on their minutes. In the instant case the stockholders, who appear to have been mostly inexperienced women, had no such protection but had to rely entirely upon the voluntary supervision of the gentlemen who represented them as directors. The assets of the corporation consisted of cash and securities which were easily transferable. It, therefore, seems to us that if ordinary care is required of the board of directors of any financial institution in the management of its affairs, the exercise of such care in supervision was required of the directors in the instant case in order to protect the stockholders who had the right to look to them for such protection.

We are, therefore, of the opinion that the decree of the lower court should be amended so as to hold all the defendant directors jointly and severally liable to the corporation for the sum of $49,520.03, with interest thereon from June 1, 1931, until paid.

And it appearing from the record that M. L. Harrison has died since the rendition of the decree complained of, and that the cause has been revived against his executors, G. M. Roberts and C. D. Hines, the cause will be remanded to the court below to be therein further proceeded with, so far as may be necessary and proper, in accordance with the views and conclusions expressed in this opinion.

*Amended and remanded.*